# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 15-24442-CIV-LENARD/GOODMAN

JAIME FAITH EDMONDSON, et al.,

      Plaintiffs,

v.

VELVET LIFESTYLES, LLC, et al.,

      Defendants.

_____/

### ORDER RE: DISCOVERABILITY OF SWINGERS' CLUB MEMBERSHIP LIST

Musicians sometimes write and sing about privacy. In their 1994 song "Pry To,"[1] American grunge/rock band Pearl Jam musically proclaimed "P-R-I-V-A-C-Y is priceless to me." Likewise, pop singer Michael Jackson sang "I need my privacy, I need my privacy" in his 2001 song "Privacy."[2] And The Kinks, in their 1971 song "20th Century Man," voiced a similar complaint: "Got no privacy/ got no liberty / 'cause the twentieth century people/ took it all away from me."[3]

These musical references to privacy generate an overarching theme which is at the heart of the parties' discovery dispute here -- a dispute which poses the following question: May Plaintiffs pursuing a false advertising Lanham Act claim obtain in

---

[1]     PEARL JAM, *Pry To*, on VITALOGY (Epic Records 1994).

[2]     MICHAEL JACKSON, *Privacy*, on INVINCIBLE (Epic Records 2001).

[3]     THE KINKS, *20th Century Man*, on MUSWELL HILLBILLIES (RCA Victor 1971).

discovery the member list and email distribution list from a "unique" and "private" clothing-optional swingers' club for "men and women who enjoy nudity and sexual activity" and who are directed to practice "safer sex" at the club by using condoms (which are available upon request)?

Defendants in this one-count, 108-page Lanham Act false advertising action operate what Plaintiffs say is a club designed to promote the "swinger and spouse-swapping lifestyle" of "like-minded individuals" from "across the country and around the world." [ECF No. 80, p. 2].  The 32 Plaintiffs are professional models who allege, in their First Amended Complaint, that Defendants have pirated and altered their images to advertise their swinger's club business interests on websites and social media accounts. They further allege that Defendants posted their misappropriated and altered images next to, or in very close proximity to, photos of explicit, hardcore pornography which are too obscene and offensive to include as exhibits to a publicly-filed complaint.

The discovery issue here concerns Plaintiffs' request to obtain information about Defendants' membership list and email distribution list. Defendants seek, in effect, a protective order, immunizing them from disclosing the requested information in response to discovery requests.[4]

---

[4]     The Undersigned's Discovery Procedures Order [ECF No. 26] does not permit discovery motions such as a motion for a protective order. Nevertheless, the dispute at issue is, for all practical purposes, Defendants' request for a protective order.

Defendants argue in post-hearing memoranda [ECF Nos. 67; 78] that the requested information is confidential and that disclosure of information about the identities of the Club's members and attendees is reasonably likely to harm them. They argue that those who follow a "swinger" lifestyle are considered by non-adherents to be "'different,' unorthodox and perhaps even immoral or sinful." [ECF No. 67, p. 2]. They say the information is protected by the First Amendment's associational privilege and that the disclosure is reasonably likely to harm the members and also harm Defendants themselves because they have promised to keep the information confidential. Defendants also assert trade secret privilege protection for the membership identity information.

Plaintiffs, however, contend [ECF Nos. 68; 74] that Defendants' interest in maintaining secrecy is "grossly exaggerated," that Plaintiffs have a critical need for the information (to prove their claims), that there is no comparable substitute for the requested information, that any concerns over disclosure would be tempered by a confidentiality agreement, that the profit-oriented, clothing-optional swingers parties are not the kind of expressive association protected by the First Amendment and that there is no evidence that there would be reprisals against members if membership information were to be disclosed.

For the reasons outlined in more detail below, the Undersigned **defers** ruling because I need additional information before issuing a substantive decision on this sensitive issue. [5]

The Undersigned is not an expert in consumer confusion and deception, surveys and polls or statistical analysis. Plaintiffs *say* they need the information to perform polls and surveys, but Defendants challenge the logic of that purported rationale in this specific factual setting. In addition, a list of swingers' club members is not the standard type of customer list which is frequently at issue in more-common commercial litigation lawsuits, such as those for unfair competition or breach of a confidentiality provision in an employment agreement. Plaintiffs say that half the swingers' club members here purportedly does not care if their identities are disclosed, but, even if true, that

---

[5]   Concerning possible objections to this Order, including the decision to defer pending the receipt of further information, magistrate judges "enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart,* 737 F.3d 1107, 1115 (7th Cir. 2013). Pursuant to Federal Rule of Civil Procedure 72(a), which governs objections to a magistrate judge's discovery rulings, the standard of review is "clearly erroneous" or "contrary to law." This is an extremely deferential standard of review, and this "high bar" is "rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.,* 794 F.3d 1259, 1272 (11th Cir. 2015). "'To be clearly erroneous, a decision must strike [the reviewing court] as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish.'" *Id.* at n. 92 (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec. Inc.,* 866 F.2d 228, 233 (7th Cir. 1988)). *See also Hiram Walker & Sons, Inc. v. Kirk Line, R.B.,* 30 F.3d 1370, 1378, n.2 (11th Cir. 1994) (where Judge Dubina, in a concurring opinion, invoked the "dead fish" analogy and described that definition as "the best I have seen").

argument ignores the point that the other half apparently *does* care (and perhaps very much so) about keeping their atypical lifestyle confidential.

To perform the balancing necessary to evaluate Defendants' interest in keeping confidential the identities of the swinger's club members, the Undersigned would need to determine the efficacy of the tools which Plaintiffs argue they will apply to the information provided. This evaluation presents a myriad of unanswered questions:

Would a poll based on unsolicited emails to Velvet Lifestyle members and email recipients be likely to generate any meaningful responses? If the poll recipients understand that they are not obligated to respond and further realize that responding might cause them to be served with a deposition subpoena, then would they likely complete and return the survey? What percentage response rate would an expert need to receive to reach any meaningful conclusion about customer confusion? Would members be likely to even remember whether they saw a photograph of a model on a website before attending the Club? Would receiving a simple online poll request generate anxiety or concern among the club members or email recipients? Has Plaintiffs' counsel or their proposed expert ever conducted a similar online poll of persons involved in unorthodox activities, and, if so, what were the results?

In addition, the Undersigned acknowledges that the basis for the information request is comparatively narrow. It is designed to promote a private agenda, not public-type goals. For example, a federal grand jury subpoena requesting that the Club

disclose the lists so that the Federal Bureau of Investigation could locate potential witnesses to a mysterious death which occurred inside the Club after a threat was mailed to the Club would yield a significantly different analysis than a request from Plaintiffs in a civil lawsuit seeking money damages in a false advertising claim.

The Undersigned also needs information from Defendants to assess the interests at issue.  As described below, the Undersigned **orders** the parties to submit essential, additional information that will help the Undersigned perform the competing interests' evaluation.

**<u>Procedural and Factual Background</u>**

Filed by 32 Plaintiffs, the initial Complaint was 681 pages, containing 4,407 paragraphs. It alleged a false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) and 8 counts under Florida statutory and common law (for which it requested supplemental jurisdiction). United States District Judge Joan A. Lenard entered an Order [ECF No. 77] dismissing Plaintiffs' Lanham Act claims without prejudice and dismissing the state law claims without prejudice. The Order gave Plaintiffs an opportunity to file an amended claim under the Lanham Act but specifically cautioned that the Court would decline to exercise supplemental jurisdiction over the state law claims (because they predominate over the Lanham Act claim). Plaintiffs then filed a one-count Amended Complaint [ECF No. 80] under the Lanham Act. The parties are participating in discovery [ECF No. 82]. Following a

discovery hearing directing Defendants to produce information, Defendants filed a motion to dismiss [ECF No. 83]. The deadline for Plaintiffs to respond has not yet expired, nor has the deadline for Defendants' optional reply.

Defendants emphasize that all members must execute a Membership Application and Agreement (the "Agreement") and note that the "Acknowledgement and Affirmation" includes a provision confirming that the applicant is "not a reporter, employee, investigator, independent contractor or informant associated with, assisting or employed by an broadcast, internet or other news or entertainment media, nor any organization which disseminates information in any way to the general public …" [ECF No. 67, pp. 1-2]. Moreover, they highlight the "Confidentiality" provision in the Agreement [ECF No. 67, p. 2]:

> Miami Velvet is a private club with a strict confidentiality requirement. Absent a valid, binding, final order form a court of appropriate jurisdiction, you agree not to reveal the identity of any members or guests of Miami Velvet for any reason whatsoever, including but not limited to the sale of names of any members or guests of Miami Velvet. Further, you agree not to disclose the activities or events that occur at Miami Velvet to any non- members of Miami Velvet. You understand that any violation of this confidentiality policy may have serious ramifications for those whose privacy you violate and may subject you to civil liability. Anyone violating this policy will have their membership revoked and banned from Miami Velvet.

Plaintiffs point out [ECF No. 68, p. 2] that Miami Velvet's own corporate representative "has conceded [in a deposition] that approximately half of its members are not shy about their affiliation with the Club." In fact, Plaintiffs note that some Club

members voluntarily chose to self-disclose their affiliation and membership by being prominently featured on the Club's website. In addition, they contend that the Club is "not under any contractual obligation to keep its email distribution lists and patron lists secret." [ECF No. 68, p. 2-3]. They also stress that the Agreement permits the Club to disclose membership information pursuant to a court order and imposes conditions for disclosure only on the members (but not the Club itself). [ECF No. 68, pp. 2-3].

**The Parties' Positions**

Plaintiffs stress their need to obtain relevant sociographic and demographic audience information to demonstrate that those who attended the Club decided to participate in the events advertised there based in part on the content of the advertisements reflecting Plaintiffs' images. They say the email distribution list (consisting of persons who received the purportedly misleading advertisements from the Club) and the patron lists (the subset of persons on the email distribution list who actually attended an advertised event at the Club) are critical for their Lanham Act false advertising claim. They argue that they need to established consumer deception or likelihood of confusion or deception to prove their false advertising claim.

Plaintiffs further contend that the law permits them to meet this burden through consumer surveys, market research, expert testimony or other evidence. They argue that courts routinely permit discovery of customer and member lists to prove customer confusion or deception, and they say there is no colorable argument that they are

seeking the discovery for any reason other than to prove their claim. In addition, they note that Defendants have failed for more than two months to sign the Confidentiality Agreement which Plaintiffs say will adequately protect any Club member's privacy rights without undermining the member's privilege of association.

In general, Plaintiffs say they intend to use the requested lists to provide information to their expert to create a statistically valid profile of a survey panel and to provide a pool of potential witnesses who can testify about the impact and effect of the advertisements and promotional material. Plaintiffs intend to use targeted email surveys which solicit information from members who attended Club events advertised with the so-called offending advertisements. Based on those survey responses, Plaintiffs intend to take a limited number of depositions but note that any member receiving a subpoena for a deposition could seek a protective order. Plaintiffs also say that these depositions would not cause any member to breach any contractual obligation to the Club if ordered to provide testimony by the Court.

Furthermore, Plaintiffs say, a member would not at a deposition be asked to identify *other* Club members; the member would merely be asked about the advertisements' impact on *that* member's consuming decisions.  The Membership Application and Agreement [ECF No. 74-1] provides that "[a]bsent a valid, binding, final order from a court of appropriate jurisdiction, you agree not to reveal the identity of any members or guests of Miami Velvet [.]" Therefore, Plaintiffs conclude, discussing

a member's *own* decisions would not violate the Agreement, which does not preclude the Club from releasing the membership list or email list.

Plaintiffs also note that they are willing to have the lists treated as "highly confidential" or "attorney's eyes only" if their expert is permitted to review the material.

Defendants, however, challenge the logic of Plaintiffs' purported need for the two categories of lists.  They say the purported relevance of the lists "requires a quantum leap of faith, one which has no basis in reality." They brand Plaintiffs' explanation as based on "inescapably bizarre theories." And they note that the lists would have to be used to somehow canvas or survey the Members (a point Plaintiffs concede) and argue that the survey would inevitably generate inaccuracy and "contaminating variables," rendering the disclosure of the lists unwarranted.

Specifically, Defendants contend that Plaintiffs would not have any legitimate way to establish (1) that any Member receiving a survey through an email is the actual person who received the promotion or is even competent to respond to the survey; (2) whether, assuming the correct person is in fact responding, the Member actually can recall viewing a promotional piece contacting a photograph of any particular Plaintiff dating back several years; (3) whether the Member (or other person responding) can remember if, at the time the promotional material was received, he or she thought he or she would: (a) see the woman in the photograph at the Club, (b) think the woman in the

photograph "would be willing to engage in 'Swinger' activities (i.e., sex)," or (c) think that the woman in the photograph personally endorsed the Club. [ECF No. 78, p. 2].

Given the provocative and unorthodox nature of swingers' clubs, Defendants argue that there is "nothing about this discovery (or the instant case) [which] is, in Plaintiffs' words, 'standard fare in cases involving claims under the Lanham Act and FDUTPA.'" [ECF No. 78, p. 2].

Although the party seeking the information about the Velvet Lifestyles' membership and email distribution lists is not the Government itself, Defendants argue that the Government would be, in practical terms, involved because the *Court* will be ordering them to make the disclosure of the lists.  [ECF No. 78, pp. 4-5].

They say the disclosure would violate associational and privacy rights and would also improperly compel the production of trade secrets (because they argue that the membership and email distribution lists are confidential customer information constituting protectable trade secrets). [ECF No. 67, pp. 7-8].

**Applicable Legal Principles and Analysis**

Defendants have not cited any legal authority which specifically and unequivocally holds that member lists for swingers clubs are worthy of special protection. Likewise, they have not cited any legal authority (or asked the Court to judicially notice anything) confirming that some segments of our society deems swingers to be different or unorthodox. On the other hand, Plaintiffs' have not in any

way challenged the notion that swingers' club members are deemed different "and perhaps even immoral or sinful." [ECF No. 67, p. 2]. Nevertheless, for purposes of this Order, I will assume the argument -- that swingers' club members engage in a lifestyle so unorthodox that they could be subject to adverse consequences if their sexual activities were to be disclosed and that they therefore treasure their privacy and right to associate confidentially -- to be correct.

## Scope of Discovery

Plaintiffs begin their legal argument [ECF No. 68, p. 3] with the argument that Miami Velvet has not demonstrated good cause for a protective order.  But Plaintiffs overlooked a more-basic step: Is the information they requested even within the permissible scope of discovery?[6] Specifically, Federal Rule of Civil Procedure 26(b)(1) defines the scope of discovery as follows: "any nonprivileged matter that is relevant to any party's claim or defense and **proportional** to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, **the importance of the discovery in resolving the issues,** and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1) (emphasis added).

---

[6]     This analysis changed relatively recently with the amendments to the Federal Rules of Civil Procedure, which took effect on December 1, 2015.

Moreover, proportionality "focuses on the marginal utility of the discovery sought." *Viagasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) (internal citations omitted). Proportionality and relevance are "conjoined" concepts; "the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Id.* (internal citation omitted). As noted in the recent amendment, "multiple factors" are relevant in assessing proportionality and "some cases may require a detailed balancing of these factors and the making of fine distinctions." *Id.*

Because relevance is evaluated as part of a proportionality analysis of the requested discovery, the merits of the claim are considered. *See generally Sumpter v. Metro. Life Ins. Co.*, No. 1:13-cv-0347, 2016 WL 772552 (S.D. Ind. Feb. 29, 2016) (denying motion to compel discovery evaluated under the new, amended version of Rule 26 after noting that the "claims appear doomed" substantively).

Therefore, the threshold questions are whether the requested lists would be important in assisting the Parties to determine the amount of damages available here for the alleged Lanham Act violation and whether the requests meet the other factors listed for the proportionality assessment. To demonstrate that the lists are within the permissible scope of discovery, Plaintiffs here must make a "threshold showing" and confront the reality that "[m]ere speculation that the information might be useful will not suffice" because litigants seeking to compel discovery must "describe with a

reasonable degree of specificity, the information they hope to obtain and its importance to their case." *Sprint Commc'n Co., L,P.,* No. 4:10-CV-04110, 2016 WL 782247, at *5 (D.S.D. Feb. 26, 2016).

Pursuant to this framework, the Undersigned notes that Judge Lenard initially dismissed the sole Lanham Act *sua sponte* with language which places the post-Order Amended Complaint in doubt.  In the dismissal Order, Judge Lenard unequivocally held that Plaintiffs "have not -- and likely cannot -- state a claim for false advertising under the Lanham Act." [ECF No. 77, p. 4]. Moreover, Judge Lenard explained that the Court would employ a fair procedure when *sua sponte* dismissing a Complaint and would therefore permit Plaintiffs to submit an amended complaint.  [ECF No. 77, pp. 4-5]. However, the language used suggests that the Court entertained significant doubts about Plaintiffs ability to successfully do so. Thus, Judge Lenard provided them with the opportunity to file an amended complaint "if they wish to do so and if they are able to do so." [ECF 77, p. 18]. Combined with the earlier language that Plaintiffs "likely cannot" state a claim, the language permitting an amended complaint implicitly cautioned Plaintiffs that they might not be able to state a Lanham Act claim.

But Plaintiffs filed an amended complaint [ECF No. 80], prompting Defendants to file a motion to dismiss [ECF No. 83], raising the very arguments that Judge Lenard stressed when dismissing the initial complaint. That dismissal motion is not yet ripe, but it generates an additional factor for me to consider in the proportionality analysis:

whether the requested discovery would be relevant if the sole claim is subject to significant challenge.

Because the motion to dismiss is before Judge Lenard and has not been referred to the Undersigned, it is inappropriate for me to conclusively determine whether Plaintiffs have stated a claim for Lanham Act false advertising in their one-count Amended Complaint. However, it *is* permissible to determine whether the stated need for the lists is proportional to the needs of the case -- and that evaluation allows an evaluation of the logic underlying Plaintiffs' request for the lists. If the purpose for the requested lists is unlikely to be accomplished, then this would factor into the overall balancing analysis.

Plaintiffs say they "intend to deploy targeted email surveys that solicit information from members who attended events at the Club that were advertised using the offending advertisements." [ECF No. 74, p. 3]. In theory, this might seem logical. But the Undersigned is not convinced that the theory would actually work in practice. According to Plaintiffs' approach, swingers' club members would provide "relevant demographic and sociographic characteristics" in response to unsolicited emails from a large law firm representing Plaintiffs who filed a lawsuit against the club they attend to pursue their unusual, arguably-provocative, lifestyle. [ECF No. 74, p. 2].

But what causes Plaintiffs to assume that responses would actually be forthcoming? Why wouldn't members simply delete the emails? Why would they

review them? And why would they **voluntarily** provide demographic and sociographic characteristics? This first stage would not involve depositions, where members would be served with *subpoenas.* Instead, this initial, critical, data-gathering stage, would involve emails requesting *optional* cooperation from individuals who could easily and safely simply ignore the unsolicited request for personal information.  So why should a court require a swingers' club to disclose its member list when the list might not even succeed in clearing the first informational hurdle?

Assuming that some members actually reviewed the unsolicited email and actually provided detailed, comprehensive demographic information, would the response rate be statistically significant enough to matter? If not, then what litigation purpose would be accomplished by requiring Defendants to disclose its member list? Wouldn't the information be wasted?

Plaintiffs next say that they would use the information to "select a pool of members for depositions to gather information on the record that will provide the necessary factual predicates for Plaintiffs' claims." [ECF No. 74, p. 3]. Apparently, Plaintiffs want to ask the members about the "the effect and impact of the advertisements" and promotional material on the members. [ECF No. 74, p. 3].  But what basis do Plaintiffs have to conclude or believe that any member who actually responds to the email inquiry would even remember in a deposition what he or she thought when viewing Plaintiffs' photographs on the Club's website? If the members

are unlikely to remember anything, then the rationale for the disclosure of their identities would dissipate.

Given these uncertainties, the Undersigned is not convinced that the requested lists are within the scope of discovery. On the other hand, I am not conclusively determining that they are outside the scope of discovery. More information is needed.

Most of the information will need to come from Plaintiffs, if they are still interested in pursuing these lists to prosecute the sole claim remaining in the federal case.[7] But some defense-provided information will be required. Specifically, Defendants shall, by October 10, 2016, file a notice advising (1) how many members its Club has; (2) how many persons are on the email marketing distribution list; (3) how many on the email distribution list have gone to the Club as a guest; (4) how does the Club determine who to put on the email list, and from where does it source the information; (5) whether there is an "unsubscribe" feature on the emails sent out on the marketing/advertising list; and (6) how many marketing/advertising recipients selected the unsubscribe feature?

Assuming that Plaintiffs wish to pursue this one-count federal lawsuit and seek discovery of the lists, they shall, by October 24, 2016, submit an affidavit or declaration

---

[7]     Plaintiffs' initial Complaint also asserted claims under Florida's Unfair and Deceptive Trade Practices Act, Florida's statute protecting the right of publicity, the common law right of publicity/unauthorized misappropriation of name or likeness, defamation, defamation per se, unjust enrichment, negligence and a claim under Florida's civil theft claim.

from their expert witness or witnesses, explaining (1) whether the expert has ever obtained survey information from members of a swingers club (or similar out-of-the-mainstream organization) on a voluntary basis; (2) whether the information was provided in response to an unsolicited email solicitation for information; (3) what minimum response rate would be necessary to create a statistically meaningful sample; (4) whether the expert predicts that the response rate here would be affected by a disclosure that the parties seeking the information had filed a lawsuit against the Club and/or notice that substantive responses might cause the member responding to be subject to a deposition subpoena; (5) whether the expert has information on whether the email distribution list provided in *Edmondson v. Caliente Resorts, LLC,* No. 8:15-cv-2672-T[8] generated any useful information, and, if so, then what information was provided, (i.e., what the response rate was and what specific use was ultimately made of the information provided); (6) the **specific** questions which would be posed in the email to the members and or the advertising recipients; and (7) their predictions on a response rate, especially when the members submit applications and agreements in which they commit to keeping secret information about the identities of other members or guests.

Defendants may submit rebuttal affidavits or declarations by November 21, 2016. No further affidavits, declarations, memoranda or other submissions are permitted on this issue absent further Court order.

---

[8]     A 2016 discovery order entered by a Tampa, Florida magistrate judge, attached to Plaintiffs' initial memorandum at ECF No. 68-2.

**Protective Order Standards**

This Court may, for "good cause," issue an order to protect a party or person from annoyance, embarrassment, oppression, or under burden or expense. Fed. R. Civ. P. 26(c)(1). In evaluating a movant's submission of "good cause," however, a court should balance the movant's interest in preventing the discovery sought against the other party's interest in seeking the discovery. *Contour Prods., Inc. v. Albecker*, No. 08-60575-CIV-DIMITRO, 2009 WL 196106, at * 1 (S.D. Fla. Jan. 23, 2009). To justify a protective order, the movant must support its case with a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Id.* (internal citations omitted).

Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, are insufficient to establish "good cause" which justifies a protective order. *Cippollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). When a party alleges harm that would result from disclosure of certain information, "the harm must be significant, not a mere trifle." *Gold Coast Prop. Mgmt., Inc. v. Valley Forge Ins. Co.*, No. 09-60029-CIV, 2010 WL 9871643, at *2 (S.D. Fla. Jan. 26, 2010) (internal citations omitted).

Because the protective order analysis requires a comparison with the interests of the party seeking the discovery, it would be difficult, if not impossible, for me to conduct this balancing without knowing more about Plaintiffs' need for the information (and whether the need is likely to yield any useful, case-relevant information).

Therefore, the Undersigned will conduct the balancing *after* receipt of additional information. It is at this point that the Undersigned will factor in Defendants' arguments that the information sought is protected by the First Amendment's Associational Privilege,[9] the so-called "zones of privacy" and the trade secrets' doctrine.

Plaintiffs acknowledge in general the legal existence of an associational privilege[10] and a right of privacy[11] but they argue that these doctrines do not protect Defendants here because they are inapplicable as a threshold matter and because they

---

[9]    In a discovery order entered by a federal magistrate judge in *Edmonson v. Caliente Resorts, LLC* (M.D. Fla. July 6, 2016) [ECF No. 68-2], the Court there distinguished between **membership lists** for the resort sponsoring "sexually-tinged events" for individuals engaged in "swinger," "spouse swapping," or "open relationship lifestyle events" and **mailing/distribution lists**. First, the Court there determined that the relevant discovery is the advertising distribution list, not the member lists. Second, the Court explained that it could "find no right of association with respect to one's name being on a distribution list for advertisements and promotions for open-to-the-public parties" and noted that defendants had not asserted the existence of such a privilege. *Id.* at pp. 8-9. This distinction is likely inapplicable here, as Plaintiffs want **both** the member lists and the email distribution lists (and it appears that they might be more interested in the member list).

[10]    *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). *See also Christ Covenant Church v. Town of Sw. Ranches*, No. 07-60516, 2008 WL 2686860, at *5-12. (S.D. Fla. June 29, 2008) (summarizing standards for invoking the associational privilege).

[11]    *Padgett v. Donald,* 401 F.3d 1273, 1280 (11th Cir. 2005) (explaining that "the Supreme Court has held that a right of privacy does exist within the liberty component of the Fourteenth Amendment" and noting that two types of interests are protected: "avoiding disclosure of certain personal matters" and protecting "an individual's personal autonomy in making certain important decisions, such as those involving marriage, contraception and procreation."). *See also Aid for Women,* 441 F.3d 1101, 1116-17 (10th Cir. 2006) (summarizing cases discussing right to informational privacy and extending right to minors).

have established a compelling need (and that measures could be taken to adequately address the privacy concerns of the members whose email identities would be disclosed pursuant to a confidentiality order limiting access to the information).

Plaintiffs have not identified their expert, but it appears as though they have located an appropriate expert. Nevertheless, the Undersigned is not sure whether an expert has in fact been located and retained, but, even if he or she has been located, Plaintiffs may wish to locate and use an additional expert, and the Undersigned is providing both sides with the time necessary to secure the affidavits and declarations which the Undersigned will use to resolve the discovery dispute involving persons who

Defendants say [ECF No. 67, p. 4] are followers of an activity "viewed as unorthodox or improper by a presumed majority of the population."[12]

**DONE AND ORDERED**, in Chambers, in Miami, Florida, on October 3, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All counsel of record

---

[12]     Defendants contend that disclosure of their members/attendees' identities will "inescapably have a chilling effect on the individual member's familial, work and community relationships." [ECF No. 67, p. 5]. They also say it is "clear" (though they have not submitted or proffered any proof) that "there is a reasonable probability that disclosure could subject the members/attendees to public scrutiny, threats, harassment or embarrassment." [ECF No. 67, p. 5]. They further argue that being associated with sexually-themed parties or events is also "reasonably likely" to cause the members/attendees to "public or private reprisals, including the loss of their jobs, especially for those members/attendees whose employment is subject to a 'morals clause' or similar limitation." [ECF No. 67, p. 5]. Defendants have not submitted any affidavits or other evidence to establish the accuracy of these arguments.