## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 15-24442-CIV-LENARD/GOODMAN

JAIME FAITH EDMONDSON, et al.,

      Plaintiffs,

v.

VELVET LIFESTYLES, LLC, f/k/a
VELVET LIFESTYLES, INC., d/b/a
MIAMI VELVET, JOY DORFMAN, a/k/a
JOY ZIPPER, PRESIDENT OF VELVET
LIFESTYLES, LLC and MY THREE
YORKIES, LLC,

      Defendants.

_____/

### *SUPPLEMENTAL* ORDER RE: DISCOVERABILITY OF SWINGERS' CLUB MEMBERSHIP LIST AND/OR EMAIL DISTRIBUTION LIST

This Order concerns Plaintiffs' discovery request for the membership and email distribution list from a private swinger's club for "men and women who enjoy nudity and sexual activity."

For reasons outlined in greater detail below, the Undersigned concludes that (1) Defendants must produce the email distribution list (but not the membership list); (2) Plaintiffs may use the information only pursuant to the provisions of the Confidentiality Agreement which they previously submitted to the Court; (3) this ruling in no way pre-

approves Plaintiffs' marketing research consultant under *Daubert*[1] or Federal Rule of Evidence 702; (4) this ruling does not opine on the reliability of Plaintiffs' expert methodology; (5) this Order relates solely to discovery, not to admissibility of the email distribution list or the report/testimony of Plaintiffs' market research expert; and (6) if Defendants have *already* told their members or email distribution recipients about the so-called consumer confusion survey which they might receive from Plaintiffs' expert or if notice has not yet been provided, when they do advise their members or email recipients -- assuming that they provide any advance notice at all -- then Defendants must immediately advise Plaintiffs' counsel.

Defendants, in this two-count, 109-page Lanham Act false advertising action, operate what Plaintiffs say is a club designed to promote the "swinger and spouse-swapping lifestyle" of "like-minded individuals" from "across the country and around the world." [ECF No. 80, p. 2].  The 32 Plaintiffs are professional models who allege, in their First Amended Complaint, that Defendants have pirated and altered their images to advertise their swinger's club on websites and social media accounts. They further allege that Defendants posted their misappropriated and altered images next to, or in very close proximity to, photos of explicit, hardcore pornography which are too obscene and offensive to include as exhibits to a publicly-filed complaint.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

The discovery issue here concerns Plaintiffs' request to obtain information about Defendants' membership list and email distribution list. Defendants seek, in effect, a protective order, immunizing them from disclosing the requested information in response to discovery requests.[2]

Defendants argue in post-hearing memoranda [ECF Nos. 67; 78] that the requested information is confidential and that disclosure of information about the identities of the Club's members and attendees is reasonably likely to harm them. They argue that those who follow a "swinger" lifestyle are considered by non-adherents to be "'different,' unorthodox and perhaps even immoral or sinful." [ECF No. 67, p. 2]. They say the information is protected by the First Amendment's associational privilege and that the disclosure is reasonably likely to harm the members and also harm Defendants themselves because they have promised to keep the information confidential. Defendants also assert trade secret privilege protection for the membership identity information.

Plaintiffs, however, contend [ECF Nos. 68; 74] the following: (1) Defendants' interest in maintaining secrecy is "grossly exaggerated;"(2) Plaintiffs have a critical need for the information (to prove their claims); (3) there is no comparable substitute for the requested information; (4) any concerns over disclosure would be tempered by a

---

[2]     The Undersigned's Discovery Procedures Order [ECF No. 26] does not permit discovery motions such as a motion for a protective order. Nevertheless, the dispute at issue here is, for all practical purposes, Defendants' request for a protective order.

confidentiality agreement; (5) the profit-oriented, clothing-optional swingers parties are not the kind of expressive association protected by the First Amendment; and (6) there is no evidence that there would be reprisals against members if the membership information were to be disclosed.

When this issue was initially presented to the Court, I postponed ruling [ECF No. 84] pending receipt of additional information. Specifically, I directed Defendants to provide information about their membership and email distribution lists.  I also required Plaintiffs to submit an affidavit from their expert (to explain the nature of the proposed survey and its likely efficacy). I directed Defendants to provide a similar expert affidavit (presumably explaining why the anticipated customer confusion survey would be unreliable). The parties complied and the issue is ripe for my ruling.

**Procedural and Factual Background**

Filed by 32 Plaintiffs, the two-count Amended Complaint [ECF No. 80] pursues two Lanham Act claims. One is for "false advertising" and one is for "false endorsement."

All members of Defendants' swinger's club must execute a Membership Application and Agreement (the "Agreement"), and the "Acknowledgement and Affirmation" includes a provision confirming that the applicant is "not a reporter, employee, investigator, independent contractor or informant associated with, assisting or employed by an broadcast, print, internet or other news or entertainment media, nor

4

any organization which disseminates information in any way to the general public[.]"

[ECF No. 67, pp. 1-2]. The Agreement also includes a "Confidentiality" provision:

> Miami Velvet is a private club with a strict confidentiality requirement. Absent a valid, binding, final order form [sic] a court of appropriate jurisdiction, you agree not to reveal the identity of any members or guests of Miami Velvet for any reason whatsoever, including but not limited to the sale of names of any members or guests of Miami Velvet. Further, you agree not to disclose the activities or events that occur at Miami Velvet to any non-members of Miami Velvet. You understand that any violation of this confidentiality policy may have serious ramifications for those whose privacy you violate and may subject you to civil liability. Anyone violating this policy will have their membership revoked and banned from Miami Velvet.

[ECF No. 67, p. 2].

Plaintiffs point out that Miami Velvet's own corporate representative "has conceded [in a deposition] that approximately half of its members are not shy about their affiliation with the Club." [ECF No. 68, p. 2].  In fact, Plaintiffs note that some Club members voluntarily chose to self-disclose their affiliation and membership by being prominently featured on the Club's website. [ECF No. 74, p. 4]. In addition, they contend that the Club is "not under any contractual obligation to keep its email distribution lists and patron lists secret." [ECF No. 68, pp. 1-2]. They also stress that the Agreement permits the Club to disclose membership information pursuant to a court order and imposes conditions for disclosure only on the members (but not the Club itself). [ECF No. 74, p. 5].

The Parties' Positions

Plaintiffs stress their need to obtain relevant sociographic and demographic audience information in order to demonstrate that those who attended the Club decided to participate in the events advertised there based in part on the content of the advertisements reflecting Plaintiffs' images. They say the email distribution list (consisting of persons who received the purportedly misleading advertisements from the Club) and the patron lists (the subset of persons on the email distribution list who actually attended an advertised event at the Club) are critical for their Lanham Act false advertising claim. They argue that they need to establish consumer deception or likelihood of confusion or deception to prove their false advertising claim.

In general, Plaintiffs say they intend to use the requested lists to provide information to their expert to create a statistically valid profile of a survey panel and to provide a pool of potential witnesses who can testify about the impact and effect of the advertisements and promotional material. Plaintiffs intend to use targeted email surveys which solicit information from members who attended Club events advertised with the allegedly offensive advertisements. Based on those survey responses, Plaintiffs intend to take a limited number of depositions but note that any member receiving a subpoena for a deposition could seek a protective order. Plaintiffs also say that these depositions would not cause any member to breach any contractual obligation to the Club if ordered to provide testimony by the Court.

6

Furthermore, Plaintiffs say, a member would not at a deposition be asked to identify *other* Club members; the member would merely be asked about the advertisements' impact on *that* member's consuming decisions.   The Membership Application and Agreement provides that "[a]bsent a valid, binding, final order from a court of appropriate jurisdiction, you agree not to reveal the identity of any members or guests of Miami Velvet [.]" [ECF No. 74-1]. Therefore, Plaintiffs conclude, discussing a member's *own* decisions would not violate the Agreement, which does not preclude the Club from releasing the membership list or email list.

Defendants, however, brand Plaintiffs' explanation as based on "inescapably bizarre theories." [ECF No. 78, p. 3]. They submitted a declaration from someone with experience in the internet advertising industry to support their theory that Plaintiffs' purported need for the data is illusory because the results produced by the survey would be inherently unreliable. [ECF No. 99-1].

Defendants say the disclosure would violate associational and privacy rights and would also improperly compel the production of trade secrets (because they argue that the membership and email distribution lists are confidential customer information constituting protectable trade secrets).

<u>The Additional Information Requested by the Court</u>

Defendants provided [ECF No. 87] the following information about the lists at issue:

The Club found 17,309 membership records (i.e., anyone who visited the club since database conversion data cutoff around 2010). There are 1,194 persons with active status (i.e., those who visited in last 2 months, plus those on longer term memberships) and 5,653 active members of the "social network" (i.e., having a profile and login).

In addition, there are 23,208 email addresses (to which the last newsletter was sent to). Of those email addresses, 1,396 newsletters "bounced" or were returned for non-delivery. Seventeen of those recipients unsubscribed (as to that particular mailing).

Approximately 4,500 of those on the email distribution list have an active member login, which is roughly the number of people that visited the Club. Many of those people are couples -- not singles.

Anyone who accesses the website and purchases a membership/event ticket or creates a profile/login is added to the Club's email distribution list. There is no process for acquiring lists from other sources. Members may choose multiple notification levels to limit or eliminate emails from the Club.

There is an "unsubscribe" feature on every email sent out on the marketing/advertising list. There are 4,587 contacts who have unsubscribed since this email system has been in use (i.e., since Feb. 2015).

Plaintiffs submitted [ECF No. 92-1] the declaration of Martin Buncher, an expert in market research.

8

Mr. Buncher has a Master's Degree in Consumer and Industrial Psychology, taught marketing to college students, served on the faculty of San Diego State University and the University of California - San Diego, contributed to marketing communication texts, and was Vice-President and a Member of the Board of the National American Marketing Association. He is also the managing director of Intercontinental Marketing Investigations, whose clients include manufacturers, service providers, government entities and social and political agencies in both the United States and abroad. His resume demonstrates extensive involvement in research studies, including research for litigation.

Plaintiffs' counsel in this case also retained Mr. Buncher as an expert in *Edmonson v. Caliente Resorts, LLC* (Case No. 8:15-cv-02762-SDM-TBM), a 2015 case filed in the Middle District of Florida ("*Caliente*"). That lawsuit is similar to the one filed here. In fact, Jaime Faith Edmondson is the lead plaintiff in both the *Caliente* action and this case. Caliente Resort and Caliente Vacation Club are a swingers' resort and timeshare-style club operating from Land O'Lakes, Florida. Mr. Buncher conducted a customer confusion survey in the *Caliente* action, using the email distribution list provided in discovery after a Tampa federal magistrate judge entered a discovery order granting in part and denying in part Defendants' motion for protective order. [ECF No. 68-2].

In that July 6, 2016 discovery order, Magistrate Judge Thomas B. McCoun III held that Plaintiffs' request for Caliente's membership list was off-target but that its request

for the mailing/distribution list was "entirely relevant" because that list "appear[s] to provide the more relevant set of data for Plaintiffs' inquiries into false advertising, consumer deception, and publication of allegedly defamatory materials than does Caliente's specific membership list." [ECF No. 68-2, p. 4]. In addition, Magistrate Judge McCoun held that the production of the distribution/mailing list, as opposed to the membership list, "should alleviate some of Defendants' concerns regarding exposure of who is and who is not a member of their organization." [ECF No. 68-2, p. 5].

These are the highlights of Mr. Buncher's declaration in this case [ECF No. 92-1]:

He conducted a web-based consumer confusion survey in *Caliente* with the email distribution list of present, former, and prospective members of Caliente Resorts, LLC and Caliente Vacation Club, LLC for a statistically significant sample of random survey subjects. He expects to conduct a similar survey in this case.

He used two different consumer samples in the *Caliente* survey. The first group consisted of a random sample of the general population using an email list he purchased. That list contains more than 122 million consumers who have provided information about their socio-economic background. He randomly selected 10,000 email addresses, and the first 300 respondents from this random sample were used in the survey.

Mr. Buncher's second sample group consisted of a random sample of persons whose email addresses appeared on an email distribution list of approximately 18,000

10

entries of present, former, and prospective members of Caliente Resort and Caliente Vacation Club. This client sample agreed to have their email addresses added to an email distribution list to receive information. From those 18,000 email addresses, Mr. Buncher sent survey invitations to 10,046 by email. Of those, 9,498 were delivered, 1,994 were opened and 287 individuals responded. There were 548 emails that either bounced or were dropped from the email server and not delivered.

According to Mr. Buncher, he selected approximately 10,000 as the appropriate survey solicitation size for both the Random Sample and Client Sample because he anticipated that this number would most probably yield the quota of 300 responses, assuming a lower than anticipated response rate. He ran the two surveys of the two sample groups simultaneously. As soon as he received 300 responses back from the Random Sample recipients, he terminated the Client survey as well. At that time, he had received 287 responses from those in the Client Sample. Mr. Buncher classified the response rate as being between 2.5% and 3%.

Mr. Buncher contends that the number of responses he received from both the Random Sample and the Client Sample generated a 95% confidence level in the data for determining the likelihood of consumer confusion arising from the unauthorized use of the Plaintiffs' images in the *Caliente* case. He also explained that "[t]he ability to generate data at the 95% confidence level was predetermined" since he had "used it in

previous cases and it has been established that courts are comfortable with this reliability factor." [ECF No. 92-1, p. 5].

Mr. Buncher's declaration explained that he would not expect to give notice to the prospective survey field about a lawsuit pending against Miami Velvet and that he did not disclose the existence of the lawsuit in *Caliente* either. He likewise explained that he would not expect to disclose in the survey questions that any respondent might be subject to a deposition and that he did not do this in the *Caliente* survey either. [ECF No. 92-1, p. 6].

According to Mr. Buncher's declaration, he and the plaintiffs learned that a high-ranking officer or employee sent a notice to all members on the *Caliente* email distribution list (without providing notice to the plaintiffs' counsel) that "suggested an attempt to preemptively interfere with Plaintiffs' confusion survey." [ECF No. 92-1, p. 6]. Apparently, that notice advised each recipient about the Court's order (that email addresses be provided), that the plaintiffs might be contacting members, and that members "had no obligation whatsoever to respond to the forthcoming survey in any way." [ECF No. 92-1, p. 6].

Based on these survey results, Mr. Buncher prepared a report which sought to understand the role, if any, that models played in advertising and to measure confusion.

Mr. Buncher concluded, in his *Caliente* Report, that "the unauthorized use of Plaintiffs' images in the *Caliente* Action has caused Caliente Resorts' members to believe that the models consented to be in the advertising, that they agreed to promote Caliente Resort, and that these models personally represent the lifestyle that is associated with Caliente Resort." [ECF No. 92-1, pp. 8-9].

Defendants submitted the declaration of Darren Franclemont in response to Plaintiffs' submission of Mr. Buncher's declaration. [ECF No. 99-1]. Mr. Franclemont has been active in the creation, preparation and distribution of advertising of "all kinds for mainstream commercial businesses, 'Gentlemen's Clubs,' and, for the purposes of this Declaration, for 'Miami Velvet,' the 'swinger's Club' which is defending" this lawsuit. [ECF No. 99-1, p. 1]. His declaration explains that he has "extensive experience in trying to promote adult oriented businesses over the internet [.]" [ECF No. 99-1, p. 1].

Mr. Franclemont did not provide his academic training.  He did, however, provide a summary of his work experience [ECF No. 98-1, p. 7], which reflects that he has been the president of "J Dog Media, Inc." since 2001 and has been the president of "DED Dog Designs, Inc." since 1994. He was also a marketing director for Entertainment USA, Inc. from 1993 to 1994 and was an art director for Beverly Hills Talent Management, Inc. in Oakland Park, Florida from 1989 to 1993.  His work experience does not seem to involve any research studies or retention as an expert

witness. Instead, his declaration explains that he has been involved in placing advertising and developing marketing campaign concepts.

Mr. Franclemont reviewed Mr. Buncher's report in the *Caliente* case. He emphasized that Mr. Buncher's declaration in this case did not reveal that his report explained that he offered to mail all respondents $3. Therefore, he notes, the first 300 respondents from the Random Sample were "actually the first three hundred respondents that wanted $3." [ECF No. 99-1, p. 4]. In addition, he points out that the "sample" would have included a group "less than 1/400,000 of one percent." [ECF No. 99-1, p. 4]. Therefore, Mr. Franclemont concludes, "it seems impossible to support the 'response rate' identified at the conclusion of the [Buncher] report." [ECF No. 99-1, p. 4].

Shifting toward the second sample group used in the *Caliente* study, Mr. Franclemont explains that the response rate then equates to "a little over 35/100ths of one percent." [ECF No. 99-1, p. 5].

Mr. Franclemont describes the number of paid responses as "miniscule" and emphasizes that "Buncher does not state how [the 95% confidence level] was 'predetermined,' or how he justifies its use." [ECF No. 99-1, p. 5]. He brands the Buncher report as "suspect" from "the outset" -- especially because the "universe of 'sample recipients' are generated from an infinitesimally small group of presumed 'Caliente' recipients of the e-mail list [.]" [ECF No. 99-1, p. 5].

He voiced his belief that "there is no valid way to attribute any 'consumer confusion' to any identifiable group, since it is well known that the 'Swinger's Club' community is unique and does not lend itself to any concept of the 'average consumer.'" [ECF No. 99-1, p. 5]. Mr. Franclemont also advised that he disagrees with Buncher's conclusion that "the email distribution list in the *Caliente* Action generated useful information" because the questions asked were "largely useless." [ECF No. 99-1, p. 6]. He also opines that circulating a similar questionnaire to Miami Velvet email list recipients or members would not be useful.

**Applicable Legal Principles and Analysis**

Defendants have not cited any legal authority which specifically and unequivocally holds that email distribution lists (which is different than a list of members) for swingers clubs are worthy of special protection.

Scope of Discovery

As explained in my initial order on this dispute, Federal Rule of Civil Procedure 26(b)(1) defines the scope of discovery as follows: "any nonprivileged matter that is relevant to any party's claim or defense and **proportional** to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, **the importance of the discovery in <u>resolving</u> the issues,** and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this

15

scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1) (emphasis added).

Moreover, proportionality "focuses on the marginal utility of the discovery sought." *Viagasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) (internal citations omitted). "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Id.* (internal citation omitted). As noted in the recent amendment to Rule 26(b)(1), "multiple factors" are relevant in assessing proportionality and "some cases may require a detailed balancing of these factors and the making of fine distinctions." *Id.*

Because relevance is evaluated as part of a proportionality analysis of the requested discovery, the merits of the claim are considered. *See generally Sumpter v. Metro. Life Ins. Co.*, No. 1:13-cv-0347, 2016 WL 772552, at *4 (S.D. Ind., Feb. 29, 2016) (denying motion to compel discovery evaluated under the new, amended version of Rule 26 after noting that the "claims appear doomed" substantively).

Therefore, as I outlined in the earlier discovery order, the threshold questions are whether the requested lists would be important in assisting the parties to determine the amount of damages available here for the alleged Lanham Act violation and whether the requests meet the other factors listed for the proportionality assessment. To demonstrate that the lists are within the permissible scope of discovery, Plaintiffs here

must make a "threshold showing" and confront the reality that "[m]ere speculation that information might be useful will not suffice" because "litigants seeking to compel discovery must describe with a reasonable degree of specificity the information they hope to obtain and its importance to their case." *Sprint Commc'ns Co., L,P. v. Crow Creek Sioux Tribal Court,* 316 F.R.D. 254, 263 (D.S.D. 2016) (internal marks and citations omitted).

Plaintiffs say they "intend to deploy targeted email surveys that solicit information from members who attended events at the Club that were advertised using the offending advertisements." [ECF No. 74, p. 3]. The additional information submitted by the parties was intended to assist the Undersigned in determining whether Plaintiffs' theory would actually work in practice. Mr. Buncher's declaration is an attempt to answer the Court's specific questions,[3] while Mr. Franclemont's declaration is an effort to convince me that the email distribution list would not be useful.

---

[3]    The Undersigned's questions were:

> (1) whether the expert has ever obtained survey information from members of a swingers club (or similar out-of-the-mainstream organization) on a voluntary basis, (2) whether the information was provided in response to an unsolicited email solicitation for information, (3) what minimum response rate would be necessary to create a statistically meaningful sample, (4) whether the expert predicts that the response rate here would be affected by a disclosure that the parties seeking the information had filed a lawsuit against the Club and/or notice that substantive responses might cause the member responding to be subject to a deposition subpoena, (5) whether the expert has information on whether the email distribution list provided in *Edmondson v. Caliente*

17

Protective Order Standards

This Court may, for "good cause," issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1). In evaluating a movant's submission of "good cause," however, a court should balance the movant's interest in preventing the discovery sought against the other party's interest in seeking the discovery. *Contour Prods., Inc. v. Albecker*, No. 08-60575-CIV, 2009 WL 196106, at * 1 (S.D. Fla. Jan. 23, 2009). To justify a protective order, the movant must support its case with a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Id.* (internal marks and citation omitted).

Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, are insufficient to establish "good cause" which justifies a protective order. *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). When a party alleges harm that would result from disclosure of certain information, "the harm must be

---

*Resorts, LLC,* No. 8:15-cv-2672-T generated any useful information, and, if so, what information was provided, what the response rate was and what specific use was ultimately made of the information provided, (6) the **specific** questions which would be posed in the email to the members and or the advertising recipients, (7) their predictions on a response rate, especially when the members submit applications and agreements in which they commit to keeping secret information about the identities of other members or guests.

[ECF No. 84, pp. 17-18].

significant, not a mere trifle." *Gold Coast Prop. Mgmt., Inc. v. Valley Forge Ins. Co.*, No. 09-60029-CIV, 2010 WL 9871643, at *2 (S.D. Fla. Jan. 26, 2010) (internal citation omitted).

The Undersigned acknowledges that each side takes diametrically opposite positions on whether the email distribution lists would enable Mr. Buncher to obtain useful information for a consumer confusion survey. Mr. Buncher has *already* conducted a similar survey in a factually analogous scenario in the *Caliente* case, but Defendants' declarant believes that the survey is unreliable. Given Mr. Buncher's training, background and experience,[4] the Undersigned is convinced, at least for discovery purposes, that the email distribution list should be produced because it is within the permissible scope of discovery.

This ruling, however, is by no means a determination that Mr. Buncher's anticipated survey in this case would pass muster under Federal Rule of Evidence 702 or *Daubert.* Likewise, it is not an indication that his survey and opinions would even be considered for substantive purposes, such as a summary judgment motion, let alone for trial purposes. Rather, this ruling is limited only to whether the email distribution list is

---

[4]      Defendants have not explained how Mr. Franclemont's experience in placing advertising for gentlemen's clubs, swinger's clubs and adult-oriented entertainment would necessarily make him a qualified expert in consumer confusion or research studies designed to investigate customer confusion. The Undersigned is not in this Order concluding that Mr. Franclemont lacks the expertise to provide expert opinion testimony on consumer confusion and/or research studies. Nevertheless, for the purpose of determining whether the email distribution list should be discoverable because Plaintiffs' expert intends to use it for a customer confusion study similar to the one he performed in the *Caliente* case, I find Mr. Buncher's background and training to be significantly more comprehensive than Mr. Franclemont's credentials.

**discoverable.** Further determinations about what further use, if any, Plaintiffs could make of Mr. Buncher's to-be-prepared report would best await a review of the report and discovery about the report, including a deposition of Mr. Buncher.

The Undersigned will now address Defendants' arguments that the information sought is protected by the First Amendment's Associational Privilege,[5] the so-called "zones of privacy," and the trade secrets doctrine.

Plaintiffs acknowledge in general the legal existence of an associational privilege[6] and a right of privacy[7] but they argue that these doctrines do not protect Defendants

---

[5]     In a discovery order entered by the federal magistrate judge in the *Caliente* action on July 6, 2016 [ECF No. 68-2], the Court there distinguished between **membership lists** for the resort sponsoring "sexually-tinged events" for individuals engaged in "swinger," "spouse swapping" or "open relationship lifestyle events" and **mailing/distribution lists**. First, the Court there determined that the relevant discovery is into the advertising distribution list, not the member lists. Second, the Court explained that it could "find no right of association with respect to one's name being on a distribution list for advertisements and promotions for open-to-the-public parties" and noted that the defendants had not asserted the existence of such a privilege. The Undersigned adopts this distinction as logical, which is why I am requiring the production of the email marketing/distribution list but not the member list.

[6]     *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). *See also Christ Covenant Church v. Town of Sw. Ranches,* No. 07-60516, 2008 WL 2686860, at *6 (S.D. Fla. June 29, 2008) (summarizing standards for invoking the associational privilege).

[7]     *Padgett v. Donald,* 401 F.3d 1273, 1280 (11th Cir. 2005) (explaining that "the Supreme Court has held that a right of privacy does exist within the liberty component of the Fourteenth Amendment" and noting that two types of interests are protected: "avoiding disclosure of certain personal matters" and protecting "an individual's personal autonomy in making certain important decisions, such as those involving marriage, contraception, and procreation"). *See also Aid for Women v. Foulston,* 441 F.3d

here because they are inapplicable as a threshold matter and because they have established a compelling need (and that measures could be taken to adequately address the privacy concerns of the members whose email identities would be disclosed pursuant to a confidentiality order limiting access to the information).

Similar to Magistrate Judge McCoun III, I, too, conclude that Defendants have failed to meet their burden that the email distribution list is a protectable trade secret. They have not demonstrated that this information derives independent economic value and that they have taken reasonable efforts to maintain its secrecy. Moreover, as noted, the Undersigned is not requiring production of the list of the specific members -- only the email distribution/mailing list.

Defendants' primary argument is the associational privilege. They say they are followers of an activity "viewed as unorthodox or improper by a presumed majority of the population."[8] [ECF No. 67, p. 5]. But Defendants have not demonstrated how the

_____

1101, 1116-17 (10th Cir. 2006) (summarizing cases discussing right to informational privacy and extending right to minors).

[8]     Defendants contend that disclosure of their members/attendees' identities will "inescapably have a chilling effect on the individual member's familial, work and community relationships." [ECF No. 67, p. 5]. They also say it is "clear" (though they have not submitted or proffered any proof) that "there is a reasonable probability that disclosure could subject the members/attendees to public scrutiny, threats, harassment or embarrassment." [ECF No. 67, p. 5]. They further argue that being associated with sexually-themed parties or events is also "reasonably likely" to cause the members/attendees to experience "public or private reprisals, including the loss of their jobs, especially for those members/attendees who employment is subject to a 'morals clause' or similar limitation." [ECF No. 67, p. 5]. Defendants have not submitted any

existence of a potential associational privilege protecting a **membership** list would automatically be applicable to a list of email recipients compiled for marketing and advertising purposes.

To enjoy the protections afforded by an associational privilege, the party asserting the privilege must first make a prima facie showing that the privilege applies. *In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1153 (D. Kan. 2010). This prima facie showing requires the party claiming the privilege to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or "chilling" of, the members' associational rights. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010). The required evidentiary showing that an associational right will be "chilled" exceeds mere subjective assertions of fear of reprisal. *In re GlaxoSmithKline plc*, 732 N.W. 2d 257, 271 (Minn. 2007). The party claiming the privilege "must demonstrate 'objective and articulable' facts that disclosure of information may chill association rights." *Id.* (internal citation omitted). Specific evidence of past or present harassment of members due to their associational ties, or harassment directed against the organization itself

---

affidavits or other evidence to establish the accuracy of these arguments. And, even if they had, that evidence would not necessarily be persuasive as to an email distribution list.

demonstrate a reasonable probability of a chill on association rights. *Id.* (internal citation omitted).

If the party claiming the privilege makes the necessary prima facie showing, then the evidentiary burden will shift to the party opposing a privilege claim to demonstrate that the information sought is rationally related to a compelling interest of the party, and the least restrictive means of obtaining the information. *See Perry*, 591 F.3d at 1161; *see also NIACCF v. Cold Stone Creamery, Inc.*, No. 12-CV-0756, 2014 WL 4545918, at *4 (S.D. Fla. Sept. 12, 2014) (finding that the disclosure of the plaintiff's membership list was appropriate given a stipulation as to the use of that information).

To engage in expressive association which would justify an associational privilege, a group must engage in some form of public or private expression. *Goodpastor v. City of Indianapolis*, 736 F.3d 1060, 1073 (7th Cir. 2013). Activities and services that are primarily **commercial** rather than communicative do not qualify as expressive association that is protected under the First Amendment. *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1196 (9th Cir. 1988).

Defendants have not met this burden.  They have not provided any actual *evidence* to support their speculative theories that the mere release of the email distribution list pursuant to a protective order would violate some type of associational privilege. They have submitted only attorney argument.

23

Moreover, the Undersigned is also persuaded by several additional factors: (1) the right of association which sometimes compels associational anonymity does not extend to a "generalized right of 'social association;'"[9] (2) the parties seeking the email distribution list are not the police, law enforcement, or any other type of Government entity -- instead, they are purely private parties; (3) although Defendants say their members are engaged in an unorthodox lifestyle, they have not also asserted the claim that they "ever took a public stance" on lifestyle-related issues or "on any issue of public political, social, or cultural importance;"[10] (4) the list will be provided subject to a confidentiality order limiting the use which Plaintiffs can make of the list;[11] (5) Plaintiffs are not competitors of Defendants; (6) the Rules governing Miami Velvet's Membership Agreement (which would not apply to most of the email recipients anyway) *permit* a

---

[9]     *See generally City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (upholding local ordinance restricting admission to dance  halls and limiting hours of operation because social association with strangers at a dance club does not implicate the First Amendment right to expressive association). *Cf. Pi Lambda Phi Fraternity v. Univ. of Pittsburgh*, 229 F.3d 435, 444 (3d Cir. 2000) (finding that fraternity lacked First Amendment protection because it merely engaged in social activities).

[10]     *Pi Lambda Phi Fraternity*, 229 F.3d at 444. The Court there noted that there was no substantial record evidence that the fraternity chapter has "done anything to actively pursue the ideals underlying" its history as being the country's first non-sectarian fraternity. The same conclusion can be reached for those on Miami Velvet's email distribution list as there is no evidence that they took a public stance on lifestyle-related issues.

[11]     Defendants will be able to designate the email distribution list with an "attorney's eyes only" classification.

member to disclose the identity of other members or guests pursuant to a court order; and (7) Plaintiffs have a clear need for the information and the Undersigned appreciates the difficulty which Plaintiffs would encounter in establishing damages if they were not able to establish consumer confusion.[12]

The profit-oriented, "clothing optional" swingers' parties that Miami Velvet's members attend are social events and Defendants have not established that they are the kind of expressive association protected by the First Amendment. *See City of Dallas*, 490 U.S. at 24-25. And, importantly, Miami Velvet cannot produce or identify any evidence that there is a reasonable probability that there will be reprisals against its members or those who attend events or even those who receive marketing material online if only its email distribution list is disclosed subject to a confidentiality-type protective order.

Accordingly, here the burden does not shift to Plaintiffs. But, even if it had, Plaintiffs have established a need for the email distribution list information to obtain customer confusion evidence through a research study. *Cf. NIACCF*, 2014 WL 4545918,

---

[12]    *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (finding that the district court's inadvertent disregard of consumer survey research required vacatur of summary judgment against seller on his claim alleging false advertising in violation of the Lanham Act and noting that "consumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive") (internal citations omitted). *See also ABC Rug & Carpet Cleaning Serv. Inc. v. ABC Rug Cleaners, Inc.*, No. 08 CIV 5737, 2009 WL 105503, at *2, 4 (S.D.N.Y. Jan. 14, 2009) (ordering production of customer lists in Lanham Act lawsuit subject to protective order designed to address concern that Defendant "spent substantial time and effort in establishing" the list which was "not readily ascertainable elsewhere").

at *4 (finding a reasonable probability that identifying members of a trade group of franchisees may subject those members to the franchisor's efforts to compel arbitration "or other actions" but also finding that the party showed a compelling need for the requested membership information and was therefore entitled to the information).[13]

For similar reasons, Defendants have not established that a zone of privacy doctrine would prevent the disclosure of an email distribution list pursuant to a protective order in which the email addresses could be restricted through an "attorney's eyes only" designation. Cases involving courts which invalidate laws prohibiting intimate sexual contact between persons of the same sex or prohibiting marriage between persons of the same sex are far afield from the scenario at issue here. Defendants have not called my attention to a factually analogous "zone of privacy" case which would preclude the production of an email distribution list in a lawsuit between purely private parties under the protection of a confidentiality order.

<u>Conclusion</u>

Defendants shall produce their email distribution list, subject to the confidentiality agreement filed as ECF No. 68-1, by December 12, 2016. In addition, Defendants shall immediately advise Plaintiffs' counsel if they have *already* told their members or email distribution recipients about the so-called consumer confusion

---

[13]     Unlike the **membership roster** at issue in *NIACCF,* this Order concerns only the production of the <u>email distribution list,</u> which the Undersigned deems far less problematic than the disclosure of a membership list.

survey which they might receive from Plaintiffs' expert. If, however, notice has not yet

been provided, then Defendants shall immediately advise Plaintiffs' counsel when they

do advise their members or email recipients -- assuming that they provide any advance

notice at all.

     **DONE AND ORDERED**, in Chambers, in Miami, Florida, on December 5, 2016.

                                            _____
                                            Jonathan Goodman
                                            UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All counsel of record