## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-24442-CIV-LENARD/GOODMAN

**JAMIE FAITH EDMONSON, et al.,**

      Plaintiffs,

**v.**

**VELVET LIFESTYLES, LLC, et al.,**

      Defendants/Third Party Plaintiffs,

**v.**

**JLFL CONCEPTS, LLC,**
**JESSICA SWINGER, and**
**JESSE SWINGER,**

      Third Party Defendants.
_____/

## ORDER DENYING DEFENDANT JOY DORFMAN'S MOTION FOR SUMMARY JUDGMENT (D.E. 139),  GRANTING IN PART AND DENYING IN PART PLAINTIFFS' CORRECTED CONSOLIDATED MOTION FOR SUMMARY JUDGMENT (D.E. 149), AND DENYING THIRD PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ALL COUNTS OF THIRD-PARTY PLAINTIFFS' COMPLAINT (D.E. 146)

**THIS CAUSE** is before the Court on Defendant Joy Dorfman's Motion for

Summary Judgment, (D.E. 139), filed April 4, 2017.  Plaintiffs[1] filed a Response on April

18, 2017, (D.E. 145), to which Dorfman filed a Reply on April 28, 2017, (D.E. 154).

_____

[1]      The thirty-two named Plaintiffs are Jaime Faith Edmondson, Ana Cheri (Moreland), Carrie Minter, Cielo Jean Gibson, Cora Skinner, Danielle Ruiz, Eva Pepaj, Heather Depriest, Irina Voronina, Jesse Golden, Jessica Burciaga, Jessica (Jessa) Hinton, Joanna Krupa, Jordan Carver, Katerina Van Derham, Kim Cozzens, Laurie Fetter Jacobs, Lina Posada, Maria Zyrianova, Marketa Kazdova, Masha Lund, Maysa Quy, Paola Canas, Rachel Bernstein Koren,

Also before the Court is Plaintiffs' Corrected Consolidated Motion for Summary Judgment, (D.E. 149), filed April 19, 2017.  Defendants filed a Response on May 3, 2017, (D.E. 157), to which Plaintiffs filed a Reply on May 10, 2017, (D.E. 163).

Also before the Court is Third Party Defendants JLFL Concepts, LLC, Jessica Swinger, and Jesse Swinger's Motion for Summary Judgment as to All Counts of Third-Party Plaintiffs' Complaint, (D.E. 146), filed April 19, 2017.  Defendants/Third Party Plaintiffs Velvet Lifestyles, LLC, Joy Dorfman, and My Three Yorkies, LLC (collectively, "Defendants") filed a Response on May 3, 2017, (D.E. 159), to which Third Party Defendants did not reply.

Upon review of the Motions, Responses, Replies, and the record, the Court finds as follows.

## I.    Background

### a.    Facts[2]

Defendant Velvet Lifestyles, LLC owns and operates a swingers club called "Miami Velvet" (hereafter, the "Club").  (Pls.' Facts ¶¶ 3, 14.)  The Club charges membership fees and user fees.  (Id. ¶ 15.)  At any given time the Club has several

---

Sandra Valencia, Sara Underwood, Tiffany Toth, Vivian Kindle, Melanie Iglesias, Lynn Geiger, Rae Young, and Rosa Acosta.  (Am. Compl. ¶¶ 23-54.)

[2]    The following facts are gleaned from Plaintiffs' Corrected L.R. 56.1 Consolidated Statement of Undisputed Material Facts, ("Pls.' Facts," D.E. 148), Defendants' Corrected Statement of Material Facts in Opposition to Plaintiff's Corrected L.R. 56.1 Consolidated Statement of Undisputed Facts, ("Defs.' Resp. Facts," D.E. 162), Third-Party Defendants' Statement of Undisputed Material Facts, ("TP Defs.' Facts," D.E. 147), and Third Party Plaintiffs' Statement of Material Facts in Opposition to Third Party Defendants' L.R. 56.1 Statement of Undisputed Facts, ("TP Pls.' Resp. Facts," D.E. 158).  All facts are undisputed unless otherwise noted.

thousand paying members from within Florida and beyond.  (Id. ¶ 16.)  The Club's gross revenues exceed $1 million per year.  (Id. ¶ 17.)  Defendants spend thousands of dollars per year on advertising for the Club's swinger events, using the internet, social media, and email, as well as permitting party promoters to re-post Defendants' advertisements on their own social media and send "text blasts" to advertise parties.  (Id. ¶ 20.)

Each Plaintiff is a professional model, actress and/or businesswoman who earns or has earned a living by promoting her image, likeness and/or identity to select clients, commercial brands, media and entertainment outlets.  (Id. ¶ 1.)  Each Plaintiff relies on her professional reputation and own brand for modeling, acting, hosting and other professional opportunities and has worked to establish herself as reliable, reputable and professional.  (Id. ¶ 2.)  Each Plaintiff has provided an affidavit indicating that they have "been vigilant in building and protecting [their] brand from harm, taint or other diminution."[3]  (See, e.g., id.)

No Plaintiff has ever been employed by, contracted with, or otherwise given permission or consent to Defendants in any way for the use of her image by Defendants to advertise, promote, market or endorse Defendants' Club or Defendants' swinger lifestyle activities.  (Pl.'s Facts ¶ 3.)  Even if asked, no Plaintiff would, under any circumstances and regardless of the compensation offered, have permitted or consented to the use of her image by Defendants to advertise, promote, market or endorse Defendants' swinger lifestyle activities hosted at the Club if asked in advance.  (Id. ¶ 4.)

---

[3]     Although Defendants argue that there is no evidence that Plaintiffs have made any effort to protect their brands, other than by filing the instant lawsuit, (Def.'s Resp. Facts ¶ 2), they provide no evidentiary support for their statement.

Nevertheless, Plaintiffs' images were used to advertise and promote Defendants' commercial activities, and Plaintiffs were never paid for this unauthorized use.  (Id. ¶ 5.) However, Defendants state that they contracted with Third Party Defendants to do their advertising and promotion, and that it was Third Party Defendants who produced the materials containing Plaintiffs' images.  (Defs.' Resp. Facts ¶ 5.)  Plaintiffs contend, and Defendants dispute, that Defendants exercised full control over the content, theme selection, creative direction and dissemination of advertisements for the Club's swinger parties that were prepared by the Third Party Defendants.  (Pls.' Facts ¶ 21.)  Plaintiffs further contend that Defendants controlled the Third Party Defendants and treated them as employees, giving them Miami Velvet email addresses and treating them as "salaried employees" for purposes of compensation.  (Id. ¶ 22.)  Defendants maintain that they treated Third Party Defendants as independent contractors.  (Defs.' Resp. Facts ¶ 22.)

Third Party Defendant Jessica Swinger was hired as an employee of Velvet Lifestyles in 2010 and worked for Velvet Lifestyles for approximately five years.  (TP Defs.' Facts ¶ 1.)  She states that she was referred to as, controlled as, and treated as an employee of Velvet Lifestyles in all relevant regards, even after she created JLFL Concepts, LLC in 2011.  (Id. ¶¶ 5-12.)  Defendants do not dispute that Jessica Swinger was an employee of Velvet Lifestyles, but they submit that she is named as a third-party defendant in this action in her other role as an independent contractor with Third Party Defendant JLFL Concepts, LLC.  (TP Pls.' Resp. Facts ¶ 1.)  It is undisputed that Third Party Defendant Jesse Swinger was not affiliated with JLFL Concepts, LLC in any way, (TP Pls.' Facts ¶ 4), but Defendants submit that "Jessica Swinger and Jesse Swinger were

4

a 'team' for all promotional purposes[,]" (id. ¶ 8).[4]  Third Party Defendants assert that they never entered into any contract or agreement, oral or written, with Defendants, (TP Defs.' Facts ¶ 14); however, Defendants state that an oral contract existed for Third Party Defendants to perform marketing for Defendants.  (TP Pls.' Facts ¶¶ 13-14.)

Defendants knew that they needed authority or releases to use a model's image. (Pls.' Facts ¶ 24.)  Defendants never obtained Plaintiffs' consent to use their images in their promotional advertising and had no authority to use any Plaintiff's image for any purpose whatsoever.  (Id. ¶ 25.)  However, Defendants claim that they relied on the Third Party Defendants to produce all of the promotional materials and therefore would not have any opportunity to obtain consent from any Plaintiff for the use of any image. (Defs.' Resp. Facts ¶ 25.)

Plaintiffs state that by using each Plaintiff's image in one or more advertisements for swinger lifestyle activities, Defendants confused and deceived consumers and potential consumers into believing that Plaintiffs knowingly permitted and consented to having their images used, agreed to endorse Defendants' business and the Club's swinger lifestyle activities, and were likely to participate in the swinger lifestyle advertised.  (Id. ¶ 28.)  Plaintiffs' expert, Martin Buncher, conducted a marketing survey that showed:

a. between 89% and 97% of the individuals sampled believed that Plaintiffs appearing in the advertisements voluntarily agreed to be in the advertisements. (Buncher Aff. Ex. A at 16-21);

---

[4]    Coincidentally, Jessica and Jesse Swinger are a married couple whose real last name is Swinger, but they do not engage in a swinger lifestyle.  (See Gonzalez Dep. (D.E. 148-44) at 27:1-9.)

b. between 73% and 75% of the individuals sampled believed that Plaintiffs appearing in the advertisements might participate in the swinger events hosted by Defendants at the Club. (Buncher Aff. Ex. A at 16-21);

c. between 87% and 94% of the individuals sampled believed the Plaintiffs appearing in the advertisements agreed to promote the activities and consumer experience provided by Defendants at the Club. (Buncher Aff. Ex. A at 16-21);

d. between 85% and 92% of the individuals sampled believed that the Plaintiffs appearing in the advertisements represented the swinger lifestyle to which Defendants' business is oriented. (Buncher Aff. Ex. A at 16-21);

e. roughly two thirds of the individuals sampled believed that the Plaintiffs appearing in the advertisements probably enjoy a swinger lifestyle similar to that reflected in the advertisements. (Buncher Aff. Ex. A at 16-21);

f. between 95% and 97% of the individuals sampled believed it was "extremely likely" the Plaintiffs appearing in the advertisements were used to create the impression that they represented the kind of women the sampled group would expect to see at the swinger lifestyle activities hosted at the Club. (Buncher Aff. Ex. A at 16-21);

g. between roughly two thirds and 87% of the individuals sampled concluded that they were more likely to consider the possibility of attending the swinger lifestyle activities hosted at the Club if responding to an advertisement in which the model Plaintiffs appeared as opposed to advertisements in which the model Plaintiffs did not appear. (Buncher Aff. Ex. A at 16-21.)

(Pls.'s Facts ¶ 29.)[5]

It is undisputed that being associated with the Club would cause harm to a person's professional reputation.  (Pls. Facts ¶ 32; Defs.' Resp. Facts ¶ 32.)  It is also

---

[5] Although Defendants purport to dispute Buncher's findings, they cite to no admissible evidence contradicting Buncher's Report.  They cite only to a Declaration filed by Darren Franclemont which was filed in opposition to a discovery motion Plaintiffs filed.  (D.E. 99-1.)  Franclemont has not been designated as an expert and did not file an expert report. Franclemont's Declaration, which was filed months before Buncher filed his Report, attacks an expert report Buncher filed in a different case currently pending in the Middle District of Florida. Buncher's expert report in that case is irrelevant to this case.

undisputed that "[e]ach Plaintiff is entitled to compensation[.]" (Pls.' Facts ¶ 33; Defs.' Resp. Facts ¶ 33.)  However, Defendants dispute the fair market valuation of Plaintiffs' damages.  (Defs.' Resp. Facts ¶ 34.)

  **b.**  **Relevant procedural history**

  On September 15, 2016, Plaintiffs filed the operative Amended Complaint accusing Defendants of: (1) False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count I), (Am. Compl. ¶¶ 615-633); and (2) False Endorsement in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count II), (id. ¶¶ 634-652). Plaintiffs seek damages, prejudgment interest, attorneys' fees, and injunctive relief.  On December 2, 2016, the Court entered an Order Denying Defendants' Motion to Dismiss the Amended Complaint.  (D.E. 100.)

  On December 16, 2016, Defendants filed an Answer to the Amended Complaint with an incorporated Third Party Complaint against the Third Party Defendants.  (D.E. 107.)  The Third Party Complaint alleges: (1) Breach of Contract (Count I), (id. ¶¶ 26-33); (2) Fraudulent Misrepresentation (Count II), (id. ¶¶ 34-41); (3) Breach of Express Warranty (Count III), (id. ¶¶ 42-48); and (4) Breach of Implied Warranty (Count IV), (id. ¶¶ 49-55).   On July 18, 2017, the Court entered an Order Denying Third Party Defendants' Motion to Dismiss Third Party Complaint.  (D.E. 169.)

  Defendant Dorfman filed her Motion for Summary Judgment on April 4, 2017, (D.E. 139); Third Party Defendants filed their Motion for Summary Judgment on April 19, 2017, (D.E. 146); and Plaintiffs filed their Corrected Motion for Summary Judgment

on April 19, 2017, (D.E. 149).  Trial is scheduled for September 9, 2017, with Pretrial

Conference scheduled for August 28, 2017.  (See D.E. 137, 173.)

## II.     Legal Standard

On a motion for summary judgment, the Court is to construe the evidence and

factual inferences arising therefrom in the light most favorable to the nonmoving party.

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment can be

entered on a claim only if it is shown "that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In

addition, under Federal Rule of Civil Procedure 56(f)(1), the Court may grant summary

judgment for the non-moving party "[a]fter giving notice and a reasonable time to

respond."  Fed. R. Civ. P. 56(f)(1); see also Gentry v. Harborage Cottages-Stuart, LLLP,

654 F.3d 1247, 1261 (11th Cir. 2011).  The Supreme Court has explained the summary

judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.  In such a situation, there can be no genuine issue
> as to any material fact, since a complete failure of proof concerning an
> essential element of the non-moving party's case necessarily renders all
> other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).  The

trial court's function at this juncture is not "to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is

genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party.  Id. at 248; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324; see also Fed. R. Civ. P. 56(c).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial."  Id. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Id.

**III.     Discussion**

The Court will begin its discussion by denying Defendant Dorfman's Motion for failure to comply with Local Rule 56.1.  Then, it will turn to Plaintiffs' Motion before considering Third Party Defendants' Motion.

### a.      Defendant Dorfman's Motion for Summary Judgment (D.E. 139)

Local Rule 56.1 provides that "[a] motion for summary judgment and the opposition thereto <u>shall</u> be accompanied by a statement of material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a) (emphasis added).  The term "shall" "normally creates an obligation impervious to judicial discretion." <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 UI.S. 26, 35 (1998) (citing <u>Anderson v. Yungkau</u>, 329 U.S. 482, 485 (1947)).  "The rule is designed to help the court identify and organize the issues in the case." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1303 (11th Cir. 2009) (citing <u>Reese v. Herbert</u>, 527 F.3d 1253, 1268 (11th Cir. 2008)).[6] "It also preserves scarce judicial resources by preventing a court from 'having to scour the record and perform time-intensive fact searching.'" <u>State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.</u>, 145 F. Supp. 3d 1154, 1158 (S.D. Fla. 2015) (quoting <u>Joseph v. Napolitano</u>, 839 F Supp. 2d 1324, 1329 (S.D. Fla. 2012)).  "When a party fails to comply with [the Rule's] provisions it is unfair to its adversary, which has a right to know the factual bases of its opponent's case and the specific foundations for those assertions of fact; and its conduct is adverse to the conservation of judicial resources, which are most efficiently deployed when the parties fulfill their adversarial functions in a rigorously organized, coherent fashion." <u>Jackson v. Broome Cty. Corr. Facility</u>, 194 F.R.D. 436, 437 (N.D.N.Y. 2000).

---

[6]      <u>Mann</u> involves the Northern District of Georgia's parallel local rule requiring statements of material facts in support of and opposition to motions for summary judgment.

Dorfman inexplicably failed to file a statement of material facts with her Motion. In their Response to Dorfman's Motion, Plaintiffs pointed out that the Motion failed to comply with Local Rule 56.1(a), (D.E. 145 at 2), but Dorfman declined to take corrective measures by, for example, moving for leave to file an untimely statement of material facts. Instead, Dorfman's attorney argued that he had, in fact, complied with Local Rule 56.1: "The introduction of the Motion sets forth a clear 'Statement' of the exact basis for the Motion, as required under Local Rule 56.1, which clearly provides Plaintiffs of adequate notice of facts as to which Joy Dorfman posits are undisputed and material." (D.E. 154 at 1.) The introduction to Dorfman's Motion for Summary Judgment contains no statement of facts, clear or otherwise, as required by Local Rule 56.1. (See D.E. 139 at 2-3.) And it certainly does not contain "specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court" as required by Local Rule 56.1(a)(2).[7]

Dorfman's failure to comply with Local Rule 56.1 has left the Court with no option but to strike or deny her Motion. See Adams Arms, LLC v. Unified Weapon Systems, Inc., Case No. 8:16–cv–1503–T–33AEP, 2017 WL 1180117, at *1-2 (M.D. Fla. Mar. 30, 2017) (denying without prejudice motion for summary judgment for movant's failure to file statement of material facts in support of motion that complied with the local rules); Jackson, 194 F.R.D. at 437 (same); Robertson v. Am. Airlines, Inc., 239 F. Supp.

---

[7]     Perhaps compounding the error, although Plaintiffs filed a Statement of Material Facts in Opposition to Dorfman's Motion for Summary Judgment, (D.E. 144), Dorfman failed to file a statement of material facts in reply thereto. Consequently, with regard to Dorfman's Motion for Summary Judgment, the Court has only one Statement of Material Facts, and it is filed by the non-movant.

2d 5, 9 (D.D.C. 2002) (striking with leave to refile motion for summary judgment where movants statement of material facts failed to comply with local rule).  The Court opts to deny the motion, and because we are now on the eve of trial, the Court cannot grant Dorfman leave to refile her motion.[8]  This is a practical, not punitive, measure dictated by the circumstances.  Moreover, the Court will still be able to examine whether genuine issues of material fact exist between Plaintiffs and Defendants, as the Parties have filed statements of fact in support of and opposition to Plaintiffs' Motion for Summary Judgment.

For these reasons, the Defendant Joy Dorfman's Motion for Summary Judgment (D.E. 139) is **DENIED**.

**b.      Plaintiffs' Motion for Summary Judgment (D.E. 149)**

Plaintiffs argue that they are entitled to summary judgment on Counts I and II of the Amended Complaint, as well as to their entitlement to damages, prejudgment interest, attorneys' fees, and injunctive relief.  (D.E. 149.)

**1.      Count I: Lanham Act False Advertising**

Count I alleges False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).  (Am. Compl. ¶¶ 615-633.)  Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), codified at 15 U.S.C. § 1125(a), provides, in relevant part:

---

[8]      Because the Court assumes that all Parties will read and observe the local rules— and certainly that each Party will accompany their motion for summary judgment with a statement of material facts—the Court does not screen motions for summary judgment when they are filed, and did not realize until very recently that Dorfman failed to accompany her Motion for Summary Judgment with a statement of material facts.  Had Dorfman timely advised the Court of this failure and moved for leave to file a statement of material facts in support of her Motion for Summary Judgment, the Court would have granted her such permission.

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

. . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A claim under § 1125(a)(1)(B) is known as a "false advertising" claim.  See Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts Inc., 299 F.3d 1242, 1246 (11th Cir. 2002).

"To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising."  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Johnson & Johnson, 299 F.3d at 1247 (citing ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 964 (D.C. Cir. 1990))).

### A.    False or misleading advertising

"The first element of a false advertising claim is 'satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading.'"  Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1308 (11th Cir. 2010)

(quoting <u>Johnson & Johnson</u>, 299 F.3d at 1247).   "When determining whether an advertisement is literally false or misleading, courts 'must analyze the message conveyed in full context,' and 'must view the face of the statement in its entirety . . . .'"  <u>Id.</u> (quoting <u>Johnson & Johnson</u>, 299 F.3d at 1248).  "The ambiguity of the statement at issue, or the lack thereof, is significant.  Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false."  <u>Id.</u> (citing <u>United Indus. Corp. v. Clorox Co.</u>, 140 F.3d 1175, 1180 (8th Cir. 1998)).   "As the meaning of a statement becomes less clear, however, and it becomes susceptible to multiple meanings, the statement is more likely to be merely misleading."  <u>Id.</u> (citing <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 158 (2d Cir. 2007)).

Plaintiffs initially argue that the way Defendants used their images to advertise and promote their Club constitutes a "literally false" advertisement because, for example, they superimpose Plaintiffs over different backgrounds, or place them next to other individuals they have never modeled with.  (D.E. 149 at 8.)  However, the Court has found no authority (and Plaintiffs have cited none) holding that the unauthorized use of a photograph to advertise a product or business constitutes a "literally false" advertisement. <u>See</u> <u>Unique Sports Prods., Inc. v. Wilson Sporting Goods Co.</u>, 512 F. Supp. 2d 1318, 1326 (N.D. Ga. 2007) ("Sampras's picture alone is not 'literally false.'").   A literally false advertisement would have stated, for example: "This model will be at Miami Velvet's next swingers party."  The mere inclusion of a photograph of an individual in an advertisement, without more, is ambiguous.   It could represent that the individual endorses the product or business, that they will be attending the event being advertised,

that they are sponsored by the business, that they are employed by the business, or that they have no affiliation with the product or business but permitted the use of their photograph in the advertisement.

In this case, the use of Plaintiffs' images in Defendants' advertising and promotions is ambiguous.  Because it is susceptible to multiple meanings, the Court finds the advertisements to be misleading.  See Osmose, 612 F.3d at 1309.

### B.    Advertisements deceived or had the capacity to deceive consumers

Plaintiffs argue that "[e]ven if not 'literally false,' Defendants' advertisements were misleading and had the capacity to deceive consumers . . . ."  (D.E. 149 at 8.)  "A plaintiff attempting to establish . . . that an advertisement is literally true but misleading, must 'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence."  Hickson Corp., 357 F.3d at 1261 (quoting Johnson & Johnson, 299 F.3d at 1247).

Plaintiffs' consumer survey expert, Martin Buncher, conducted a marketing survey that included responses from two groups—(1) 300 Miami Velvet patrons,[9] and (2) a random control group of 300 individuals.  (See Buncher Report, D.E. 148-45 at 12-13.)[10] The survey showed:

---

[9]    The respondents were randomly sampled from a list of email addresses appearing on Defendants' email distribution list.  (D.E. 148-45 at 12.)

[10]    Because Buncher's Report does not contain page numbers, the Court will cite to the page numbers of Docket Entry 148-45 that were automatically generated by the Court's electronic filing system.

a. 89% of the random sample and 97% of the patrons believed that Plaintiffs appearing in the advertisements voluntarily agreed to be in the advertisements. (Id. at 17.)

b. 73% of the random sample and 75% of the patrons believed that Plaintiffs appearing in the advertisements might participate in the swinger events hosted by Defendants at the Club. (Id.)

c. 87% of the random sample and 94% of the patrons believed the Plaintiffs appearing in the advertisements agreed to promote the activities and consumer experience provided by Defendants at the Club. (Id.)

d. 85% of the random sample and 92% of the patrons believed that the Plaintiffs appearing in the advertisements represented the swinger lifestyle to which Defendants' business is oriented. (Id.)

e. Roughly two thirds of the individuals sampled believed that the Plaintiffs appearing in the advertisements probably enjoy a swinger lifestyle similar to that reflected in the advertisements. (Id.)

f. 95% of the random sample and 97% of the patrons believed it was "extremely likely" the Plaintiffs appearing in the advertisements were used to create the impression that they represented the kind of women the sampled group would expect to see at the swinger lifestyle activities hosted at the Club. (Id. at 18.)

(Pls.'s Facts ¶ 29.)  In light of Buncher's survey results, the Court finds that Plaintiffs have adequately come forward with evidence of deception.  Hickson Corp., 357 F.3d at

1261; Johnson & Johnson, 299 F.3d at 1247; Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 844-45 (11th Cir. 1983).

Defendants did not hire a survey expert to rebut Buncher's findings because, according to Defendants, "the basic issues involving the Plaintiffs' Lanham Act claims did not merit" the hiring of such an expert.  (Defs.' Resp. Facts ¶ 31.)  Instead, they cite to the Declaration of Darren Franclemont who provided a statement in opposition to Plaintiffs' efforts to discover Defendants' membership list.[11]   (See D.E. 99-1.) Franclemont has not been designated as an expert and has provided no expert report.  See Fed. R. Civ. P. 26(a)(2)(A) & (B) (providing that a party must disclose the identity of expert witnesses and the expert must provide a written report).  Franclemont did not date his Declaration, but it was filed on the docket on November 28, 2016.  (D.E. 99-1.) Therein, he challenges a similar expert report Buncher prepared in a similar case, Edmonson v. Caliente Resorts, LLC, No. 8:15-cv-02672-SDM-TBM (M.D. Fla.).  (See id. ¶¶ 5-21.)  It says nothing about Buncher's expert report in this case, which was issued February 24, 2017—several months after Franclemont filed his Declaration.  (See D.E. 148-45.)

Pursuant to Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent

---

[11]     During the litigation, an issue arose as to whether Plaintiffs were entitled to discovery of Defendants' membership list.  On October 3, 2016, Magistrate Judge Jonathan Goodman entered an Order in which he solicited affidavits and declarations from the Parties to help him resolve the issue.  (D.E. 84.)  In Response to Judge Goodman's Order, Defendants filed Franclemont's Declaration on November 28, 2016.  (D.E. 99-1.)

to testify on the matters stated." Quite simply, Franclemont's declaration is inadmissible in evidence because it is irrelevant to the facts at issue in this case. Mr. Buncher's Report in the Caliente Resorts case has not been introduced in this case and, therefore, is not relevant to the issues in this case. Franclemont has not been designated as an expert in this case and, even if he had been, he has offered no opinion as to Mr. Buncher's Report in this case. The Court will therefore not consider it for purposes of this summary judgment Motion. See Woodard v. Town of Oakman, Ala., 970 F. Supp. 2d 1250, 1266 (N.D. Ala. 2013) (declining to consider declaration filed in support of summary judgment bcause it was irrelevant to any of the plaintiffs' claims); EEOC v. W. Customer Mgmt. Grp., LLC, 899 F. Supp. 2d 1241, 1253 (N.D. Fla. 2012) (same).

Defendants declined to depose Mr. Buncher in this case and have offered no evidence rebutting his findings on the deceptive nature of the advertisements at issue in this case. Accordingly, the Court finds that Plaintiffs have established that the subject advertisements deceived, or had the capacity to deceive consumers.

### C.   Deception's effect on purchasing decisions

Having established that the subject advertisements deceived or had the capacity to deceive consumers, Plaintiffs must next establish that "the deception had a material effect on purchasing decisions[.]" Johnson & Johnson, 299 F.3d at 1247. This element requires that Plaintiffs "establish that 'the defendant's deception is likely to influence the purchasing decision.'" Id. (quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002)). "The materiality requirement is based on the premise that not all deceptions affect consumer decisions." Id. at 1250.

18

Here, Buncher's marketing survey revealed that two-thirds of the random sample and 88% of the patrons responded that they were more likely to consider attending the swinger lifestyle activities hosted at the Club if responding to an advertisement in which Plaintiffs appeared as opposed to advertisements in which the Plaintiffs did not appear. (D.E. 148-45 at 18.)   Furthermore, 69% of the patrons felt that the advertisements promoted an activity that was interesting and something they might engage in, while only 7% of the random sample agreed.  (Id.)  Conversely, only 9% of the random sample and 3% of the patrons felt that the models did not play a noteworthy role in motivating people to learn more about Miami Velvet, while 72% of the random sample and 86% of the patrons felt that the models played a major role.  (Id. at 16.)  Based on this evidence, the Court finds that Plaintiffs have adequately come forward with evidence that the deceptive advertisements had a material effect on purchasing decisions.

Defendants failed to offer any admissible evidence to rebut Buncher's findings. Accordingly, the Court finds that Plaintiffs have established that Defendants' deceptive advertisements had a material effect on purchasing decisions.

### D.       Affects interstate commerce

Next, a claim for false advertising under the Lanham Act requires Plaintiffs to establish that the "misrepresented product or service affects interstate commerce[.]" Johnson & Johnson, 299 F.3d at 1247.

Defendants concede that that "the Club spent thousands of dollars per year in advertising for Club events, using the internet, including social media and email[.]" (Defs.' Resp. Facts ¶ 20.)  They further concede that "Defendants' advertisements for

Club activities had a fundamentally commercial purpose, which was to increase membership and attendance at said events." (Id. ¶ 23.) Finally, it is undisputed that "the Club has several thousands of members paying membership fees at any one time who come from both inside and outside the state of Florida." (Id. ¶ 16.) Based on these undisputed facts, the Court finds that Plaintiffs have presented sufficient evidence that the Club substantially affects interstate commerce. See 907 Whitehead Street, Inc. v. Secretary of U.S. Department of Agriculture, 701 F.3d 1345, 1351 (11th Cir. 2012) ("[I]t is well-settled that, when local businesses solicit out-of-state tourists, they engage in activity affecting interstate commerce.")[12] (citing Camps v. Newfound/Owatona, Inc. v. Town of Harrison, Me., 520 U.S. 564, 573 (1997)); United States v. Ballinger, 395 F.3d 1218, 1226 (11th Cir. 2005) (noting that telecommunications networks are channels of interstate commerce); United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004) ("The internet is an instrumentality of interstate commerce.") (citations omitted).

Defendants offered no response to Plaintiffs' argument that the Club substantially affects interstate commerce. Accordingly, the Court finds that Plaintiffs have established that the Club substantially effects interstate commerce.

### E.     Plaintiffs' injury

Finally, a claim for false advertising under the Lanham Act requires Plaintiffs to show that they have been, or are likely to be, injured as a result of the false advertising. Johnson & Johnson, 299 F.3d at 1247.

---

[12]     The Court adopts the analysis of 907 Whitehead Street in its Order Denying Defendants' Motion to Dismiss First Amended Complaint. (See D.E. 100 at 13-15.)

In his deposition testimony as Velvet Lifestyles' corporate representative, Randy Dorfman, conceded that being publicly associated with a swingers club like Miami Velvet could be harmful to one's professional reputation. (Dorfman Dep., D.E. 148-35 at 236-39.) Furthermore, it is undisputed that "Defendants knew they needed authority or releases to use a model's image," (Defs.' Resp. Facts ¶ 24), that they "never obtained consent to use Plaintiffs' images," and "had no authority to use any Plaintiff's image for any purpose whatsoever," (Pls.' Facts ¶ 25). (See Dorfman Dep. at 216:18-23 ("We had no authority to use those images."); id. at 234:21-24 ("I stipulated we 100 percent did not have the right to use those images. I'm not denying it.").) Moreover, it is undisputed that Plaintiffs are entitled to be compensated for at least the fair market value for the use of the photos, (see Pls.' Facts ¶ 6; Defs.' Facts ¶ 6), but Defendants' contest the amount of the fair market value associated with each Plaintiff, (Defs.' Facts ¶ 6).

Plaintiffs' damages expert, Stephen Chamberlin, issued a 108-page Report evaluating and retroactively valuing the fair market value "of all presently known image infringements, in the aggregate," at $5,415,000. (Chamberlin Report (D.E. 148-33) at 7.) This "fair market measure of damages provides only a baseline valuation and does not account for the damage to each Plaintiff's professional standing and publicity value." (Id.) Mr. Chamberlin believes that such "damage to professional standing and publicity value," in the aggregate, totals $16,245,000. (Id. at 8.) Defendants did not depose Mr. Chamberlin.

Defendants' damages expert, Mark Zablow, submitted a report stating that Mr. Chamberlin's fair market value "is not being calculated scientifically nor has it taken into

the [sic] main factors and deal points of a traditional Talent contract." (Zablow Report (D.E. 157-1) at 2.) Zablow also disagrees with Chamberlin's decision to value Plaintiffs as "traditional models or celebrities" and not as "social media models" who are typically compensated "at a much lower rate than Mr. Chamberlain [sic] is assigning to his science." (Id.) Zablow also states that Chamberlin's "damage-to-brand" calculation is "grossly overestimated . . . ." (Id.)

In any event, based on the Parties submissions and the record evidence, it is undisputed that Plaintiffs have been injured, and the only dispute is the valuation of those damages. Accordingly, the Court finds that Plaintiffs have established that they have been injured as a result of the false advertising.

The Court further finds that based on the foregoing, there is no genuine issue of material fact as to Defendants' liability for false advertising under the Lanham Act, as Plaintiffs have established all five elements of a false advertising claim and Defendants have offered no evidence in rebuttal (except as to the value of damages, which is not an element of the claim). Accordingly, the Court finds that Plaintiffs are entitled to summary judgment as to Count I.

### 2. Count II: Lanham Act False Endorsement

In Count II, Plaintiffs allege false endorsement under the Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Certain claims under § 1125(a)(1)(A) are known as "false endorsement" claims. <u>See</u> <u>Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.</u>, 683 F.3d 1266, 1278 (11th Cir. 2012). In the Eleventh Circuit, a claim for false endorsement is generally treated as a claim for trademark infringement or "false association." <u>See id.</u> ("[W]e have never treated false endorsement and trademark infringement claims as distinct under the Lanham Act."); <u>Tana v. Dantanna's</u>, 611 F.3d 767, 777 n.9 (11th Cir.2010) ("[W]e have . . . never recognized a separate claim of false endorsement, distinct from trademark infringement under § 43(a) . . . .")); <u>SCQuARE Int'l, Ltd. v. BBDO Atlanta, Inc.</u>, 455 F. Supp. 2d 1347, 1372 (N.D. Ga. 2006) (equating "false endorsement" claim with "false association" claim). "To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show '(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'" <u>Tana</u>, 611 F.3d at 773 (quoting <u>Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.</u>, 106 F.3d 355, 358 (11th Cir. 1997)).

### A.      Trademark rights

With respect to the first element, "the 'mark' at issue is the plaintiff's identity." ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 926 (6th Cir. 2003) (citation omitted). However, Plaintiffs do not have to prove that they have valid trademarks in their image to prevail on their false endorsement claim.  See Unique Sports Prods., 512 F. Supp. 2d at 1325.  "As the Sixth Circuit explained in Parks, 'even though Rosa Parks' name might not be eligible for registration as a trademark . . . a viable cause of action also exists under § 43(a) if consumers falsely believed that Rosa Parks . . . sponsored or approved [defendant's] song.'"  Id. (quoting Parks v. LaFace Records, 329 F.3d 437, 447 (6th Cir. 2003)); see also Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1107 (9th Cir. 1992) (upholding Tom Waits' Lanham Act claim against Frito-Lay as a result of an unauthorized commercial suggesting that Waits endorsed Frito-Lay's products); Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 627 (S.D.N.Y. 1985) ("The [Lanham] Act's prohibitions . . . have been held to apply to misleading statements that a product or service has been endorsed by a public figure."); Geisel v. Poynter Prods., Inc., 283 F. Supp. 261, 267 (S.D.N.Y. 1968) ("[A] 'false representation', whether express or implied, that a product was authorized or approved by a particular person is actionable under Section 43(a)[.]"). Plaintiffs will still have a viable cause of action if consumers were likely to believe, falsely, that Plaintiffs sponsored or approved the activities Defendants' advertisements were promoting.  Id. ("Plaintiff . . . has a viable cause of action under § 43(a) if consumers were likely to believe, falsely, that Pete Sampras sponsored or approved the 70 Ball Pick-up").

Defendants argue that the Lanham Act requires a "recognizable brand" to support a claim of false endorsement, and argue that "Plaintiffs[] are simply not the 'recognizable celebrities' they claim themselves to be[.]" (D.E. 157 at 6-7.)   Although many of the cases involving this type of false endorsement/false association claim under the Lanham Act use the term "celebrity," the question of whether celebrity status is required to prevail was not an issue in those cases because the plaintiff's celebrity status was undisputed: "Rosa Parks was a civil rights icon;[13] Tiger Woods is the most famous golfer of his generation;[14] Woody Allen perhaps the most famous film maker of his.[15]"  Arnold v. Treadwell, 642 F. Supp. 2d 723, 734 (E.D. Mich. 2009).

Courts specifically addressing the question of whether celebrity status is required to prevail on a Lanham Act false endorsement claim have answered in the negative.  See id. at 734-35; Lancaster v. The Bottle Club, Case No.: 8:17-cv-634-T-33JSS, 2017 WL 3008434, at *6-7 (M.D. Fla. July 14, 2017).  In Arnold, the court relied on the analysis in Condit v. Star Editorial, Inc., 259 F. Supp. 2d 1046, 1051-52 (E.D. Cal. 2003), which observed that "'a majority of circuits require a commercial interest in a mark, that is, at a minimum, a present intent to commercialize a mark,' and that in order to sustain her false association claim, the plaintiff must 'at least allege an existing intent to commercialize an interest in identity.'"  Id. (quoting Condit, 259 F. Supp. 2d at 1052).  Acknowledging that some non-celebrities, like the aspiring model in Arnold, have such a present intent to

---

[13]      Parks v. LaFace Records, 329 F.3d 437 (6th Cir. 2003).

[14]      ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 922 (6th Cir. 2003).

[15]      Allen v. Nat'l Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985)

commercialize their identity or image, the court in <u>Arnold</u> found that a plaintiff bringing a false endorsement claim under the Lanham Act need not establish that she is a "celebrity." <u>Id.</u> at 733-35.   Rather, she need only establish "an existing intent to commercialize an interest in identity." <u>Id.</u> at 734 (quoting <u>Condit</u>, 259 F. Supp. 2d at 1052).

In <u>Lancaster</u>—a case that is factually indistinguishable from the one at bar—the plaintiffs were twenty models and/or actresses who, like Plaintiffs in this case, earned "a living by promoting her image and likeness to select clients, commercial brands, media and entertainment outlets, as well as relying on her reputation and own brand for modeling, acting, hosting, and other opportunities." 2017 WL 3008434, at *1.  The lead defendant in <u>Lancaster</u>—like Miami Velvet in this case—was a swingers club. <u>Id.</u>  In promoting the club, the defendants used the plaintiffs' images in various advertisements without compensating the plaintiffs and without the plaintiffs' permission. <u>Id.</u> at *2.  On the defendants' motion to dismiss, the defendants argued that the plaintiffs' images were not protectable marks. <u>Id.</u> at *6.  Relying on <u>Arnold</u>, the court found the plaintiffs need not establish that they are celebrities, and that they had adequately alleged that they "have utilized their images and likenesses for commercial purposes, as shown by their modeling careers described in the Amended Complaint." <u>Id.</u> at *7.  Accordingly, the plaintiffs' false endorsement claim survived the motion to dismiss. <u>Id.</u>

The Court agrees with <u>Arnold</u> and <u>Lancaster</u> and finds that Plaintiffs need not establish that they are celebrities to prevail on their Lanham Act false endorsement claim; instead, they are required to show "an existing intent to commercialize an interest in

26

[their] identit[ies]."  Arnold, 642 F. Supp. 2d at 734 (quoting Condit, 259 F. Supp. 2d at 1052).

It is undisputed that "[e]ach Plaintiff is a professional model, actress and/or businesswoman who earns or has earned a living by promoting her image, likeness and/or . . . to select clients, commercial brands, media and entertainment outlets . . . ." (Pls.' Facts ¶ 1; Defs.' Resp. Facts ¶ 1.)  It is further undisputed that "[e]ach Plaintiff relies on her professional reputation and own brand for modeling, acting, hosting and other professional opportunities . . . ." (Pls.' Facts ¶ 2; Defs.' Resp. Facts ¶ 2.)  The record evidence supports these undisputed facts.  (See Pls.' Decls. (D.E. 148-1 – 148-32) ¶ 8) (declaring that the use of each Plaintiffs' image "is subject to considerable negotiation," and their image "may only be used with my express authority subject to the terms and conditions of the agreement(s) I have entered into with that particular client."); (Chamberlin Report, D.E. 148-33 at 10, 18-112 (describing each Plaintiffs' professional experience and assigning a commercial value to the images used by Defendants).)

Therefore, the Court finds that Plaintiffs have established the first element of a false endorsement claim.  Arnold, 642 F. Supp. 2d at 735.

### B.    Consumer confusion

The second element of a Lanham Act false endorsement/false association claim is "that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'"  Tana, 611 F.3d at 773 (quoting Lone Star Steakhouse, 106 F.3d at 358).  "While nearly identical to the likelihood-of-confusion standard . . . for federal trademark infringement claims [under §

27

32 of the Lanham Act], § 43(a) of the Lanham Act 'is broader . . . in that it covers false advertising or description whether or not it involves trademark infringement.'" Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc., 830 F.3d 1242, 1265 (11th Cir. 2016); (quoting Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994)).

It is undisputed that Defendants used each Plaintiff's image without permission. (See Pls.' Facts ¶¶ 3, 5; Defs.' Resp. Facts ¶¶ 3, 5.)  Furthermore, as discussed in Sections III(b)(1)(B) & (C), supra, Plaintiffs' consumer survey expert, Martin Buncher, found that Defendants' unauthorized use of Plaintiffs' images caused confusion as to the affiliation, connection, or association between Plaintiffs and Defendants' business, or as to Plaintiffs' sponsorship or approval of Defendants' business.  For example:

a.  87% of the random sample and 94% of the patrons believed that Plaintiffs agreed to promote Miami Velvet;

b.  89% of the random sample and 97% of the patrons believed that Plaintiffs had agreed to be in the advertisement;

c.  73% of the random sample and 75% of the patrons believed that Defendants were using Plaintiffs' images to make them think that Plaintiffs might participate in some of the events being advertised;

d.  85% of the random sample and 92% of the patrons felt Plaintiffs represent the swinger lifestyle to which Defendants' business is oriented; and

e.  Roughly two-thirds of both samples believed Plaintiffs probably enjoy a swinger lifestyle.

(Buncher Report, D.E. 148-45 at 17.)  Defendants failed to offer any admissible evidence contradicting Buncher's findings.

Because the undisputed evidence establishes that (1) Plaintiffs have a present intent to commercialize their image, and (2) Defendants' use of Plaintiffs' image was confusing to consumers, the Court finds that Plaintiffs are entitled to summary judgment on Count II.

### 3. Damages, prejudgment interest, attorneys' fees, and injunctive relief

Next, Plaintiffs argue that they are entitled to summary judgment on the issue of damages, prejudgment interest, attorneys' fees, and injunctive relief.  (D.E. 149 at 14-17.)

### A. Damages

With respect to damages, Plaintiffs rely on the report of their damages expert, Stephen Chamberlin.  (Id. at 14.)  However, as previously discussed in Section III(b)(1)(E), supra, Defendants have presented conflicting evidence as to Plaintiffs' damages.  (See Zablow Report (D.E.  157-1) at 2.)

Chamberlin assigned a total fair market value of $5,415,000 for actual damages—i.e., "of all presently known image infringements, in the aggregate[.]"  (Chamberlin Report (D.E. 148-33) at 12.)  This number represents the amount Defendants would have had to pay Plaintiffs' to use their images in the manner they did had they gone through normal negotiations.  (Id.)  Chamberlin assigned a $16,245,000 fair market value of damage to Plaintiffs' professional standing and publicity value.  (Id.)

Defendants' expert, Mark Zablow, submitted a report stating that Mr. Chamberlin's fair market value "is not being calculated scientifically nor has it taken into the [sic] main factors and deal points of a traditional Talent contract." (Zablow Report (D.E. 157-1) at 2.) Zablow also disagrees with Chamberlin's decision to value Plaintiffs as "traditional models or celebrities" and not as "social media models" who are typically compensated "at a much lower rate than Mr. Chamberlain [sic] is assigning to his science." (Id.) Zablow also states that Chamberlin's "damage-to-brand" calculation is "grossly overestimated . . . ." (Id.) Although Plaintiffs argue that Zablow failed to offer a fair market value that contradicts Chamberlin's, (D.E. 163 at 8), it is not Defendants' burden to prove the amount of damages. Accordingly, the Court finds that a genuine issue of material fact exists as to the amount of Plaintiffs' damages, and Plaintiffs' request for summary judgment on the issue of damages is **DENIED**.

### B.    Prejudgment interest

Without a damages figure, the Court cannot calculate prejudgment interest. Accordingly, the Plaintiffs' request for summary judgment on the amount of prejudgment interest is **DENIED**.

### C.    Attorneys' fees

Under Section 35(a) of the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Eleventh Circuit has stated that "[s]uch an award is available in actions under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) . . . ." Montgomery v. Noga, 168 F.3d

1282, 1304 (11th Cir. 1999) (citing Rickard v. Auto Publisher, Inc., 73 F.2d 450, 458 (11th Cir. 1984)).

"While Congress has not further defined 'exceptional,' the legislative history of the Act suggests that exceptional cases are those where the infringing party acts in a malicious, fraudulent, deliberate, or willful manner." Burger King Corp. v. Pilgrim's Pride Corp., 15 F.3d 166, 168 (11th Cir. 1994) (some internal quotation marks omitted). "An 'exceptional' case may also be one in which 'evidence of fraud or bad faith exists.'" Tobinick v. Novella, 207 F. Supp. 3d 1332, 1341 (S.D. Fla. 2016) (quoting Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., 253 F.3d 1332, 1335 (11th Cir. 2001)). "Based on Burger King and Tire Kingdom, it was previously understood that, in the Eleventh Circuit, '[b]ad faith or fraud [was] necessary for a case to be 'exceptional'' under the Lanham Act." Id. (quoting Cardinal Freight Carriers, Inc. v. Cardinal Logistics, Inc., 155 F. Supp. 2d 1352, 1354 (S.D. Fla. 2001)).

However, in a recent case "considering an identically worded fee provision in the Patent Act, the Supreme Court rejected a standard from the Federal Circuit that required evidence of misconduct and subjective bad faith." Id. (citing Octane Fitness, LLC v. ICON Health & Fitness, Inc., __ U.S. __, 134 S. Ct. 1749, 1756 (2014)). "Although the Eleventh Circuit has not yet considered the effect of Octane Fitness on its Lanham Act 'exceptional case' jurisprudence, district courts in this circuit and other circuit courts have consistently held that a showing of subjective bad faith or fraud is no longer required." Id. (citations omitted).

31

The Court has reviewed the Parties' arguments and the relevant case law and has determined that this case is not the "exceptional" case envisioned by Congress when it enacted 15 U.S.C. § 1117(a).  There is nothing exceptional about a lawsuit over the unauthorized use of a model's stock photograph to promote a business.  Although Plaintiffs believe that Defendants' conduct was willful, the deposition testimony of Mr. Dorfman's and the Club's manager, Jason Silvera, casts doubt as to Defendants' willfulness.  (See Dofman Dep., D.E. 148-35; Silvera Dep., D.E. 148-38.)

For example, Mr. Dorfman testified that when he learned that a model had complained about the unauthorized use of her image, he "went berserk" and told Jessica Swinger to "[t]ake it down immediately.  Don't ever do it again."  (D.E. 148-35 at 99:11-13; see also id. at 99:19-24; 100:1-2.)  He further testified that he assumed that Jessica Swinger had licenses to use the images.  (Id. at 101:3-4.)  Mr. Dorfman was adamant that he took control of the situation and "put the fear of God into" Jessica Swinger so that she would never do it again.  (Id. at 101:25; 102:1.)  Silvera testified that when he first heard about the instant lawsuit, he contacted Jessica Swinger and there was a "lot of shouting." (D.E. 148-38 at 37:8.)  He "was really pissed off[.]"  (Id. at 39:2.)

Plaintiffs argue that willfulness can be inferred from the fact that after Mr. Dorfman learned that they had no license to use the images, he suggested altering the images to bypass use restrictions.  (D.E. 149 at 15.)  However, Mr. Dorfman's suggestions were never implemented.  (Dorfman Dep. at 177:2-6.)

Finally, Plaintiffs argue that willfulness can be inferred because Defendants failed to remove some of the offending advertisements from the internet even after receiving a

cease and desist letter.  (D.E. 149 at 15-16.)  However, this appears to have been an oversight because when Defendants received the letter they instructed their promoter "to make sure everything was off the site." (Dorfman Dep, at 194:4-7.)

The Lanham Act permits courts to exercise discretion and award attorneys' fees in "exceptional cases[.]"  15 U.S.C. § 1117.  The Court finds that this is not an exceptional case.  Accordingly, Plaintiffs request for summary judgment on the issue of attorneys' fees is **DENIED**.

### D.    Injunctive Relief

Finally, Plaintiffs move for summary judgment as to their request for injunctive relief.  (D.E. 149 at 17.)  Defendants argue that "there is no need for such extraordinary relief at this point, since the Defendants have already removed any offending images." (D.E. 157 at 18.)

Under the Lanham Act, "a plaintiff is entitled to permanent injunctive relief if the plaintiff succeeds on the merits of his or her claims and if the equities involved favor injunctive relief."  PetMed Express, Inc. v. MedPets.Com, Inc., 336 F. Supp. 2d 1213, 1223 (S.D. Fla. 2004) (citing Neva, Inc. v. Christian Duplications Int'l, Inc., 743 F. Supp. 1533, 1548 (M.D. Fla. 1990)).  The Lanham Act explicitly provides for this remedy:

> [C]ourts . . . shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.

15 U.S.C. § 1116(a).  "Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2)

remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." Angel Flight of Ga., Inc. v. Angel Flight of Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). "[I]n 'ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day.'" Id. (quoting SunAmerica Corp. v. Sun Life Assur. Co. of Canada, 77 F.3d 1325, 1336 (11th Cir. 1996)). "The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks—even in cases in which more than one entity has a legal right to use the mark." Id. (citing SunAmerica Corp., 77 F.3d at 1336-37).

In Angel Flight of Georgia, the Eleventh Circuit held that because the district court found that confusion was inevitable, it "was entitled to enjoin [the defendants] from uses of the mark that would continue to cause public confusion." Id. Here, too, the Court found that Plaintiffs established consumer confusion from Defendants use of their images. (See supra Section III(b)(2)(B).)

In PedMed Express, the court concluded that even though the defendants voluntarily discontinued using the infringing domain names, a permanent injunction was appropriate "to prevent Defendants from resuming their infringing use." 336 F. Supp. 2d at 1233 (citing Nutrivida, Inc. v. Inmuno Vital, Inc., 46 F. Supp. 2d 1310, 1319 (S.D. Fla. 1998) (granting permanent injunctive relief pursuant to section 1116(a) "in order to reduce the threat that Nutrivida will resume its infringing activities."); Pepsico, Inc. v.

Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1178 (C.D. Cal. 2002) (granting permanent injunction because "[t]hough it appears unlikely . . . that Defendant's allegedly wrongful conduct continued after Plaintiffs initiated this action or will continue in the future, in the absence of opposition from the non-appearing defendant, it cannot be said that it is absolutely clear that Defendant's allegedly wrongful behavior has ceased and will not begin again.")

Based on this authority, the Court finds that Plaintiffs have established that they are entitled to a permanent injunction barring Defendants from using their images to promote their commercial interests.   Accordingly, Plaintiffs' request for summary judgment as to injunctive relief is **GRANTED**.

**c.**      **Third Party Defendants' Motion for Summary Judgment (D.E. 146)**

Third Party Defendants argue that they are entitled to summary judgment as to all counts of the Third Party Complaint.   (See D.E. 146.)   They argue that they were Defendants' employees and, as such, Defendants would be liable to Plaintiffs under the doctrine of respondeat superior.   (Id. at 3-7.)   They further argue that even if they are deemed to be independent contractors, they are entitled to summary judgment on each count of the Third Party Complaint.   (Id. at 7-12.)

**1.      Whether Third Party Defendants were employees**

"Everyone agrees" that if Third Party Defendants are considered employees of Defendants, then they cannot be liable for the claims asserted against them in the Third Party Complaint.   (D.E. 159 at 5.)

35

Here, it is undisputed that Jessica Swinger was an employee of Defendants.[16] (See, e.g., TP Pls.' Facts ¶¶ 1-2.)  And the undisputed facts and evidence establish that Jessica Swinger was, at least for some purposes, Defendants' employee.  (See TP Defs.' Facts ¶¶ 1-5, 9-10, 12-13.)

What is disputed is whether, in addition to being Defendants' employee, Jessica Swinger, along with Jesse Swinger, separately entered into an oral contract with Defendants to be independent contractors who, through JLFL Concepts, LLC, produced Defendants' promotional materials.  (See TP Pls.'s Facts ¶¶ 1-2, 5-7, 10.)  For example, although Jessica Swinger received a W-2 as an employee of Defendants, (TP Pls.' Facts ¶ 2), Third Party Defendants also received a Form 1099 from Defendants, (id.).  According to the Internal Revenue Service's website:

> Employers use Form W-2, Wage and Tax Statement, to:
>
> - Report wages, tips, and other compensation paid to an employee.
> - Report the employee's income and social security taxes withheld and other information.
> - Report wage and withholding information to the employee and the Social Security Administration. The Social Security Administration shares the information with the Internal Revenue Service.
>
> Payers use Form 1099-MISC, Miscellaneous Income, to:
>
> - Report payments made in the course of a trade or business to a person who's not an employee or to an unincorporated business.
> - Report payments of $10 or more in gross royalties or $600 or more in rents or compensation. Report payment information to the IRS and the person or business that received the payment.

---

[16]     The Parties do not indicate whether Jesse Swinger was also an employee of Defendants.

Internal Revenue Service, Form 1099-MISC & Independent Contractors: https://www.irs.gov/help-resources/tools-faqs/faqs-for-individuals/frequently-asked-tax-questions-answers/small-business-self-employed-other-business/form-1099-misc-independent-contractors/form-1099-misc-independent-contractors (last visited July 27, 2017). Defendants argue that this shows they were independent contractors. (D.E. 159 at 3.)

Having reviewed the Parties' submissions and the relevant evidence, the Court finds that a genuine issue of material fact exists as to whether Third Party Defendants were independent contractors for purposes of producing Defendants' promotional materials.

### 2.     Count I: Breach of oral contract

Third Party Defendants argue that even if they are deemed to be independent contractors, they are entitled to summary judgment on Count I of the Third Party Complaint because there was no binding oral contract. (D.E. 146 at 7.) They argue that Defendants have not and cannot produce any evidence of such an oral contract, and that all of the evidence shows instead that Third Party Defendants were Defendants' employees. (Id.)

"The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." Terzis v. Pompano Paint & Body Repair, Inc., 127 So. 3d 592, 596 (Fla. Dist. Ct. App. 2012) (quoting Merin Hunger Codman, Inc. v. Wackenhut Corr. Corp., 941 So. 2d 396, 398 (Fla. Dist. Ct. App. 2006)). "An oral contract, such as the one in this case, is subject to the basic requirements of contract law

such as offer, acceptance, consideration and sufficient specification of essential terms." St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004) (citations omitted).  A plaintiff can establish the existence of a valid oral contract by showing, for example, "the date the contract was executed, the nature of the work required to be performed pursuant to the contract, and the contract's payment terms."  Aspsoft, Inc. v. WebClay, 983 So. 2d 761, 768 (Fla. Dist. Ct. App. 2008) (citing Carole Korn Interiors, Inc. v. Goudie, 573 So. 2d 923 (Fla. Dist. Ct. App. 1990)).  "A party seeking to establish the existence of an oral contract has a burden to present evidence which preponderates by the greater weight." Theocles v. Lytras, 518 So. 2d 936, 937 (Fla. Dist. Ct. App. 1987) (citations omitted).

Here, Third Party Defendants argue only that there is no evidence regarding the essential terms of the oral contract.  (D.E. 146 at 8.)  They argue that they made discovery requests upon Defendants seeking information or documents that would support Defendants' allegation of a valid oral contract, but Defendants never provided any information in response to these requests.[17]  (Id.)

The only references to an oral contract in Defendants' Statement of Material Facts in Opposition to Third Party Defendants' Statement of Undisputed Facts are in Paragraphs 13 and 14.  (D.E. 160 ¶¶ 13-14.)  Those paragraphs cite no record evidence; instead, they cite to Paragraphs 2 and 3 of Defendants' Statement of Facts.  (See id.) Paragraph 2, in turn, cites to the deposition transcripts of Randy Dorfman and the Club's manager, Jason Silvera.  (Id. ¶ 2 (citing Dorfman Dep. at 42-44, 48-51; Silvera Dep. at

---

[17]     On July 12, 2017, Third Party Defendants filed a Motion to Strike Pleadings and/or Dismiss as Discovery Sanctions for Failure to Comply with Discovery Requests.  (D.E. 166.)  That Motion is currently pending the Court's consideration.

30-37).)  Paragraph 3 also cites Dorfman and Silvera's deposition transcripts; it further cites the deposition transcript of Marilyn Gonzalez, as well as declarations executed by Marilyn Gonzalez, Joy Dorfman, and Jason Silvera.  (Id. ¶ 3 (citing Dorfman Dep. at 22-32, 42, 92-96, 126; Silvera Dep. at 30-35, 38-39, 55, 98, 100-101, 104-105, 114-115, 125, 154, 176; Gonzalez Dep. at 27, 52; Joy Dorfman Decl. (D.E. 139-1); Silvera Decl. (D.E. 139-2), Gonzalez Decl. (D.E. 139-3).)

The pages of Dorfman's deposition transcript to which Defendants cite say nothing about an oral contract.  The closest Dorfman comes to identifying an oral contract is stating that Jesse Swinger was an independent contractor and "I think he was a DJ, and I believe he did the social media[.]"  (Dorfman Dep. at 50.)

The pages of Jason Silvera's deposition transcript to which Defendants cite state that Jessica Swinger was a subcontractor, not an employee, who "handled all our promotion, on-line promotion, making up the flyers, and I think that's it.  All of our on-line marketing."  (Silvera Dep. at 30:21, 31:3-5.)  Silvera also testified that Jesse Swinger was a "[c]ontractor" who "handled Twitter and Facebook, social media."  (Id. at 31:21-22, 24.)  Silvera further testified that he did not remember how much Defendants compensated Jessica Swinger for her services.  (Id. at 33:7.)  He testified that Jessica Swinger was paid a flat fee, but the fee was not memorialized in any written document.  (Id. at 34:20-24.)  "We asked her how much would it cost to make flyers and do all of this, and she told us the price and we agreed to it."  (Id. at 35:2-4.)

> Q      So what – what were the terms?  What did she – what responsibilities did she have to –

39

> A    To make the flyers, to promote the club on social media,
> Twitter or Facebook, SDC, and other – other websites pertaining to our
> club.  She handled all the marketing.

(Id. at 35:16-21.)  Later in the deposition, Silvera surmised that Defendants paid Jessica

Swinger approximately $500 per week, "or maybe a little bit more, not sure."  (Id. at

98:15-16.)

Marilyn Gonzalez's deposition testimony says nothing about an oral contract, but

indicates that Jessica Swinger "was involved in marketing[,]" (Gonzalez Dep. (D.E. 148-

44) at 27:15-16), and that Jesse Swinger "DJ'd at the club a few times," (id. at 27:25).

Gonzalez's Declaration indicates that Jessica Swinger would provide the promotional

materials for the parties Gonzalez threw at the Club.  (D.E. 139-3 ¶ 6.)

Joy Dorfman's Declaration says nothing about any agreement with Third Party

Defendants, oral or otherwise.  (See D.E. 139-1.)

Jason Silvera's Declaration avers that he "would provide 'party themes' or

concepts, and the dates for such 'party themes' and concepts, via email, to Jessica L.

Swinger . . . and her business partner, Jesse Swinger . . . , whom I knew provided graphic

artist and promotional services to the Club through their entity, JLFL Concepts, LLC.

(D.E. 139-2 ¶ 5.)  "I viewed [the Swingers'] services to be provided through an oral

contract between the Club and JLFL Concepts, LLC, through the actions of [the

Swingers]."  (Id. ¶ 7.)  "It was my understanding that  [the Swingers], through their

entity, JLFL Concepts, LLC, pursuant to the oral contract, were to take full responsibility

to produce and make all decisions relating to Miami Velvet's promotional, advertising,

marketing and endorsement activities . . . ."  (Id. ¶ 8.)  "As a specific term and condition

of the oral contract, the Club required [the Swingers], through their entity, JLFL Concepts, LLC, to verify that any and all images or photographs used for any and all promotional, advertising, marketing and endorsement activities . . . would be fully licensed and authorized, with appropriate releases and/or permission for their use." (Id. ¶ 9.)

In light of the foregoing, the Court finds that Defendants have produced sufficient evidence that the Parties entered into an alleged valid oral contract.  See Carole Korn Interiors, 573 So. 2d 924 (finding that the plaintiff had adequately alleged breach of oral contract where the plaintiff alleged it had entered into oral contract with defendants for interior design services, that company had provided agreed services, that defendants breached contract by refusing to remit payment, and that company suffered damages). Accordingly, the Court finds that a genuine issue of material fact exists as to whether an oral contract existed between Defendants and Third Party Defendants, and Third Party Defendants' request for summary judgment as to Count I is **DENIED**.

### 3.    Count II: Fraudulent misrepresentation

Count III of the Third Party Complaint alleges that "[a]s a specific term and condition of the oral contract, [Defendants] required that any and all images or photographs used for any and all promotional, advertising, marketing and endorsement activities . . . would be fully licensed and authorized, with appropriate releases and/or permission for their use."  (TP Compl. ¶ 37.)  The Third Party Complaint alleges that "Third Party Defendants agreed to said specific term and condition and represented that they would comply with same."   (Id. ¶ 38.)  Defendants allege that they relied on this

representation and, to the extent any of Plaintiffs' Lanham Act allegations are true, Third Party Defendants' made fraudulent misrepresentations.  (Id. ¶ 40.)

Third Party Defendants argue that Count II pleads a theory of fraud in the inducement of an oral contract, not fraud sounding in tort.  (D.E. 146 at 9.)  They argue that because there was no oral contract, as alleged in Count I of the Third Party Complaint, there can be no finding that there was a fraudulent misrepresentation.  (D.E. 146 at 9 (citing Wellcraft Marine Corp. v. Outdoor World, Inc., 533 So. 2d 775, 776 (Fla. Dist. Ct. App. 1988) ("Count II, by its clear terms, pleads a theory of fraud in the inducement of an oral contract, not fraud sounding in tort.  Because the jury specifically found that no oral contract existed between the parties, its finding of fraud in the inducement of an oral contract cannot be sustained.")).)

However, the Court has found that there is a genuine issue of material fact as to whether an oral contract existed between the Parties.  (See supra Section III(c)(2).) Accordingly, Third Party Defendants argument fails to the extent it relies on the non-existence of an oral contract.

Third Party Defendants further argue that Defendants have failed to present any evidence concerning any misrepresentations of the type described in Count II of the Third Party Complaint.  (D.E. 146 at 10.)  In their Response brief, Defendants cite no statement from their Statement of Material Facts, and cite no evidence establishing any fraudulent misrepresentations.

Under Florida law, to establish fraud in the inducement, a plaintiff must show: (1) a misrepresentation of a material fact; (2) that the representor of the misrepresentation

knew or should have known of the statement's falsity; (3) that the representor intended that the representation would induce another to rely and act on it; and (4) that the plaintiff suffered injury in justifiable reliance on the representation.  Hillcrest Pac. Corp. v. Yamamura, 727 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 1999) (citing Lou Bachrodt Chevrolet, Inc. v. Savage, 570 So. 2d 306 (Fla. Dist. Ct. App. 1990)).

As previously noted, Jason Silvera's Declaration provides that "[a]s a specific term and condition of the oral contract, the Club required [the Swingers], through their entity, JLFL Concepts, LLC, to verify that any and all images or photographs used for any and all promotional, advertising, marketing and endorsement activities . . . would be fully licensed and authorized, with appropriate releases and/or permission for their use." (D.E. 139-2 ¶ 9.)  If the jury finds that there is a valid oral contract, it could also find that Third Party Defendants fraudulently induced Defendants to enter the agreement by misrepresenting that they would obtain licenses and permission for all images used. Accordingly, the Court finds that a genuine issue of material fact exists, and Third Party Defendants' request for summary judgment as to Count II is **DENIED**

### 4.    Counts III & IV:  Breach of express and implied warranty

Finally, Third Party Defendants argue that they are entitled to summary judgment as to Counts III and IV of the Third Party Complaint, (D.E. 146 at 10-12), which allege breach of express and implied warranty, respectively, (D.E. 107 at 44-47).

With respect to Count III, Third Party Defendants argue that express warranties must be clearly and unambiguously stated.  (D.E. 146 at 10.)  With respect to Count VI,

Third Party Defendants argue that claims for implied warranty are not cognizable in Florida for a contract for services.  (Id.)

As to Count III, it appears that Third Party Defendants argue that no express warranty could have existed because there was no contract.  (Id. at 10-11.)  However, having previously concluded that genuine issues of material fact exist as to whether a contract existed between Defendants and Third Party Defendants, (see supra Section III(c)(2)), Third Party Defendants' Motion for Summary Judgment as to Count III is **DENIED**.

Plaintiffs argue that even if there was a valid contract, they are entitled to summary judgment as to Count IV because implied warranties only attach to contracts for the sale of goods or property.  (D.E. 146 at 11 (citing Marini v. Town & Country Plaza Merch. Assoc., 314 So. 2d 180, 182 (Fla. Dist. Ct. App. 1975) ("An implied warranty arises from a Sale of goods or property though it has on some occasions been extended to a lease.")).)  Defendants argue that "Third Party Defendants entered into an oral contract to provide services and goods."  (D.E. 159 at 13.)

The Third Party Complaint alleges an oral contract in which Third Party Defendants agreed to provide a service—specifically, "to take full responsibility to produce and make all decisions relating to Miami Velvet's promotional, advertising, marketing and endorsement activities[.]"  (TP Compl. ¶ 21.)  The Court finds that the alleged contract contemplates the sale of goods in the form of advertisements and promotional materials.  The Court further finds that a genuine issue of material fact exists as to whether Third Party Defendants breach an implied warranty that any images used in

the advertisements and promotional materials would be fully licensed and authorized. Therefore, Third Party Defendants' Motion for Summary Judgment as to Count IV is **DENIED**.

## IV.   Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.  Defendant Joy Dorfman's Motion for Summary Judgment (D.E. 139) is **DENIED**;

2.  Plaintiffs' Corrected Consolidated Motion for Summary Judgment (D.E. 149) is **GRANTED IN PART AND DENIED IN PART** consistent with this Order;

3.  Plaintiffs are entitled to summary judgment as to liability for Count I (Lanham Act False Advertising) and Count II (Lanham Act False Endorsement);

4.  Plaintiffs are entitled to summary judgment as to their request for injunctive relief; Plaintiffs shall have thirty days from the date of this Order to file a Proposed Permanent Injunction with the Court; if Defendants object to any provision of the Proposed Permanent Injunction, they shall have seven days to file Objections;

5.    Third Party Defendants' Motion for Summary Judgment (D.E. 146) is

**DENIED.**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 28th day of July,

2017.

_Joan A. Lenard_
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**